**UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF MAINE**

|  |  |
|---|---|
| COVETRUS, INC. and VETERINARY DATA SERVICES, INC.<br><br>    Plaintiffs,<br><br>    v.<br><br>ACTIAN CORPORATION<br><br>    Defendant. | Case Number: 2:21-cv-00097-LEW |

**ACTIAN'S MOTION FOR SUMMARY JUDGMENT OF BREACH OF CONTRACT AND COPYRIGHT INFRINGEMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION...........................................................................................................1

II.    BACKGROUND .........................................................................................................1

   A.    The Parties .............................................................................................................1

   B.    The Agreement .......................................................................................................2

   C.    Actian's Audit of Use ............................................................................................4

III.    LEGAL STANDARD ..................................................................................................4

IV.    ARGUMENT ...............................................................................................................5

   A.    Summary Judgment Should Be Entered in Favor of Actian That VDS' Use of The
   Software Was Not Licensed by Actian ........................................................................5

      1.    Actian's End User License Agreement ("EULA") Governs VDS' Use of the Software 6

      2.    VDS Breached the Terms of the EULA ....................................................................6

      i.    The EULA is a Valid Contract that VDS Entered Into During Installation of the
      Software ............................................................................................................................7

      ii.    Actian Fully Performed Under the EULA .................................................................8

      iii.    VDS Breached Section 6 of the EULA by Using the Software to Provide Computer
      Services to Third Party Veterinary Offices and PIMS Vendors ...........................................8

      iv.    Additionally and In the Alternative, VDS Breached Section 1 of the EULA by Over-
      Deploying the Software ....................................................................................................11

      v.    Actian Suffered Damages Resulting From VDS's Breaches..........................................13

   B.    Summary Judgment Should Be Entered in Favor of Actian That VDS Has Infringed
   Actian's Copyrights in the Software .............................................................................15

   C.    Summary Judgment Should Be Entered in Favor of Actian That Covetrus Has
   Infringed Actian's Copyrights in the Software ...............................................................17

V.    CONCLUSION .............................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Aquila, LLC v. City of Bangor*, 640 F. Supp. 2d 92, 99 (D. Maine 2009) .................................... 17

*Atrium Med. Ctr. LP v. Houston Red C LLC*, 595 S.W. 3d 188, 193 (Tex. 2020) ....................... 18

*Baum-Holland v. Hilton El Con Mgmt., LLC*, 964 F.3d 77, 87 (1st Cir. 2020) ............................. 9

*Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677, 689 (1st Cir. 2023) ............................................. 9

*Coker v. Coker*, 650 S.W. 2d 391, 393 (Texas 1983) .................................................................... 14

*Frontier Communs. Corp. v. Barrett Paving Materials, Inc.*, No. 07-113-B-S, 2009 U.S. Dist.
LEXIS 80474, at *36-38 (D. Me. Aug. 14, 2009) .................................................................... 24

*Greenburg v. Puerto Rico Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987).................... 9

*Jenny B. Realty, LLC v. Danielson, LLC*, 456 F. Supp. 3d 307, 317 (D. Mass. 2020)................. 18

*Johnson v. Gordon*, 409 F.3d 12, 17 (1st Cir. 2005) .................................................................... 20

*Medical Coll. of Wisconsin, Inc. v. Attachmate Corp.*, No. 15-CV-151-JPS, 2016 U.S. Dist.
LEXIS 20462, 2016 WL at *16 (E.D. Wis. Feb. 19, 2016)..................................................... 19

*Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009).................................................. 9

*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S. Ct. 2764, 2776 (2005) .............. 21

*Montfort-Rodriguez v. Rey-Hernandez*, 504 F.3d 221, 224 (1st Cir. 2007) .................................. 9

*Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) ........................................................ 9

*Oliphant Fin., LLC v. Galaviz*, 299 S.W.3d 829, 834 (Tex. App.—Dallas 2009, no pet.)........... 11

*OmniSYS, LLC v. Actian Corporation*, Cause No. DC-18-09789 (Dist. Ct., Dallas County, Texas)
.................................................................................................................................................. 14

*Princeton Excess & Surplus Lines Ins. Co. v. R.I. Cranston Ent. Inc.*, 2024 U.S. Dist. LEXIS
53592, at *38 (D.R.I. March 26, 2024)..................................................................................... 18

*R&P Enters. v. La Guarta*, 596 S.W. 2d 517, 518, 519 (Texas 1980) ......................................... 14

*Range v. Calvary Christian Fellowship*, 530 S.W. 3d 818, 831 (Tex. App. 2017)...................... 18

*Reversion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 782-83 (N.D. Tex.
2006) ......................................................................................................................................... 12

*Rutkoski v. Evolv Health, LLC*, 05-17-00088-cv, 2019 WL 101209f at *15................................ 11

*Saenger Org. v. Nationwide Ins. Licensing Assocs.*, 119 F.3d 55, 59 (1st Cir. 1997)................. 19

*Small Bus. Bodyguard, Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 305 (S.D.N.Y. 2017)
.................................................................................................................................................. 21

*Society of Holy Transfig. Monastery Inc. v. Gregory*, 689 F.3d 29, 39 (1st Cir. 2012) ............... 19

*Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000) ......................................... 9

*Tasini v. New York Times Co.*, 206 F.3d 161, 170, 187 (2d Cir. 2000) *aff'd*, 553 U.S. 483 (2001)
............................................................................................................................ 20

*Tiras v. Bailey Props., L.L.C.*, 659 F. App'x 753, 756 (5th Cir. 2016)................................... 10, 17

*United States v. Bestfoods*, 524 U.S. 51, 63, 118 S. Ct. 1876, 1885 (1998) ................................ 24

**Rules**

Federal Rule of Civil Procedure 56 ......................................................................... 5, 9

Local Rule 56 ................................................................................................... 5

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, Defendant Actian Corporation ("Actian"), hereby moves for summary judgment on plaintiffs Covetrus, Inc. ("Covetrus") and Veterinary Data Services, Inc. ("VDS") (collectively, "Plaintiffs")'s First Amended Complaint (Dkt. 38). Actian respectfully submits that there are no issues of material fact genuinely in dispute and Actian is entitled to judgment as a matter of law.

## I.    INTRODUCTION

In their First Amended Complaint (Dkt. 38, "FAC"), Plaintiffs assert a single claim for Declaratory Judgment relating to their use of Actian's DataConnect software. Dkt. 38 ("FAC") at 40-51. Plaintiffs request two primary declarations: (1) that VDS's use of the software has been within the use thereof licensed by Actian (Dkt. 38 at ¶ 48); and (2) that Plaintiffs have not infringed any copyright owned by Actian, *id*. at ¶ 49. Actian then counterclaimed for breach of contract and copyright infringement. Dkt. 235 at ¶¶ 42-56. Actian hereby moves for summary judgment that Plaintiffs are not entitled to either declaration, and that Actian is entitled to summary judgment on its claims for breach of contract and copyright infringement, because Plaintiffs' exploitation of the Software was not permitted or licensed by Actian, and such uses constitute copyright infringement.

Plaintiffs seek in the alternative a third declaration that, if they are found to have infringed any copyright by Actian, damages should be limited because their infringement was not willful, among other defenses. *Id*. at ¶ 50. If the instant motion is granted, Actian respectfully requests that trial should therefore proceed on the issue of Actian's damages.

## II.    BACKGROUND

### A.  The Parties

Actian is a computer software company and the successor-in-interest to Pervasive Software, Inc. ("Pervasive"). Actian's Statement of Material Facts in Support of its Motion for

1

Summary Judgment ("SMF"), ¶¶ 1 and 2. One of Actian's software products is DataConnect, Version 9.2.7.10, also referred to as Data Integrator (the "Software"). SMF ¶ 3. The Software allows a user to map and copy data from one system or application to another system or application. SMF ¶ 4.

VDS is in the business of providing data integration, conversion, and support services to Practice Information Management Services ("PIMS") vendors that serve the veterinary industry. SMF ¶ 7. Covetrus owns businesses and services in the veterinary industry and is the ultimate parent of VDS. SMF ¶ 8. VDS uses the Software for its conversion service, where it maps historical data from veterinary office computer systems, moves that data into VDS's systems, and reconfigures the data for use going forward with the PIMS' system. SMF ¶ 9. VDS's customers are Practice Information Management Services, while the veterinary offices are the customers of the PIMS. SMF ¶ 10. Plaintiffs employ numerous persons who have either themselves installed and operated the software, or instructed others to do so. SMF ¶ 12.

### B. The Agreement

The end user license agreement associated with the Software is the 2008 End User License Agreement ("EULA"). SMF ¶¶ 15-18. The Software cannot be installed or used without accepting the EULA. SMF ¶ 22. The parties to the EULA are Actian (successor to Pervasive, whose name appears on the EULA) and "Licensee" or "You" which is defined as "your company." SMF ¶ 25. Section 15.3 of the EULA provides that it is governed by the laws of the State of Texas, exclusive of its choice of law provisions. SMF ¶ 27. The EULA contains several provisions relevant to the instant motion. Section 1A of the EULA states:

> If you have licensed software that is identified on the sales invoice, on the media package or on the install screen as design or development software, then the following installation limitations shall apply-* You may install the Software only in a single location on a hard disk or other storage device. * You

2

may install the Software on a network server used only to install or run the Software over an internal network; however, **you must acquire and dedicate a license for each individual who will use the Software.** * You may install and use each licensed copy of the Software on one home or portable "Secondary" computer.  However, another person may not use the Software on the Secondary computer at the same time the Software on the primary computer is being used.

SMF ¶ 28 (emphasis added).

Section 2 of the EULA states:

Backup and Copies.  The following backup limitations shall apply-* You may make a reasonable number of copies of the Software only for archival backup and security reasons in order to protect your investment from loss. * You may not install copies of the Software for fail-over or disaster recovery without purchasing additional licenses for such purposes. * Unauthorized copying of either the Software or Documentation is expressly forbidden.  * You may print copies of the Documentation or any part thereof from the electronic help included with your Software solely for your internal use.

SMF ¶ 30.

Section 4 of the EULA states:

Title, ownership rights, and intellectual property rights in and to the Software and Documentation will remain in Pervasive or its suppliers. Copyright laws of the United States and International Treaty provisions protect the Software and Documentation. Except as expressly authorized in this Agreement, you agree not to use, rent, lease, sublicense, distribute, transfer, copy, reproduce, display, modify, create derivative works of, time share or dispose of the Software or Documentation or any part thereof. Pervasive retains ownership of the Software and Documentation and reserves all rights not expressly granted to you.

SMF ¶ 31.

Section 6 of the Agreement states:

[VDS] may not directly or indirectly sublicense, lease or rent the Software for third party use without prior written approval of Pervasive.  You may not use, access, or allow access to the Software in any manner to provide service bureau, ASP, time-sharing, or other computer services to third parties without prior written approval of Pervasive.

SMF ¶ 32.

3

Section 15.5 of the Agreement provides that Licensee will "maintain sufficient records, logs, and other materials ('Records') sufficient to document that your use of the Software is in accordance with the terms of this Agreement," and that Action "may audit such records upon reasonable notice. SMF ¶ 33.

**C. Actian's Audit of Use**

On December 9, 2020, Actian informed VDS that the maintenance term of their DataConnect licenses would soon be coming up for renewal, and that before Actian was able to provide a renewal quote, it was required to obtain a completed self-audit form, along with the results of the associated licensing utilities. SMF ¶ 35. "Maintenance" refers to Software, and specifically to updates to Software to maintain its compatibility with ongoing versions of operating systems and existing functionality. SMF ¶ 36. On January 15, 2021 VDS returned the self-audit form and information, which showed use of the Software. SMF ¶ 40. The audit results showed that VDS was using the Software for approximately twelve users, on twenty-one unique machines, across 112 total cores. SMF ¶ 42. The audit also showed that VDS was using the Software for commercial purposes and to provide services to third parties, including, for example, using the Software to host or support various customers, to convert data from one system to a new one for its clients locally, and use of its maps/processes to move from that intermediate database to the format its clients expected. SMF ¶¶ 45-48. Actian has never authorized such uses. SMF ¶¶ 13 and 51. When Actian brought this to Plaintiffs' attention, they filed the instant lawsuit seeking declaratory relief.

**III.    LEGAL STANDARD**

Summary judgment is appropriate when viewing all factual disputes in the light most favorable to the nonmoving party, no genuine issue of material fact exists that would prevent

judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); *Montfort-Rodriguez v. Rey-Hernandez*, 504 F.3d 221, 224 (1st Cir. 2007). On a summary judgment motion, "[a] genuine dispute exists where 'a reasonable jury could resolve the dispute in favor of the nonmoving party.'" *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009) (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000)). Furthermore, "material" means a contested fact has the potential to change the outcome of the suit under the governing law. *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001).

At summary judgment, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose [her] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold record." *Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677, 689 (1st Cir. 2023) (quoting *Greenburg v. Puerto Rico Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987)). The party opposing summary judgment "bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Baum-Holland v. Hilton El Con Mgmt., LLC*, 964 F.3d 77, 87 (1st Cir. 2020) (quoting *Theidon v. Harvard Univ.*, 948 F.3d 477, 494 (1st Cir. 2020)).

## IV.    ARGUMENT

### A. Summary Judgment Should Be Entered in Favor of Actian That VDS' Use of The Software Was Not Licensed by Actian

For the reasons discussed below, summary judgment should be entered in favor of Actian on Plaintiffs' first request for a declaration "that VDS' use of the Software has been within the use thereof licensed by Actian." Dkt. 38 at ¶ 48.

1.  **Actian's End User License Agreement ("EULA") Governs VDS' Use of the Software**

Plaintiffs designated Henry W. Jones III as their 30(b)(6) witness regarding "[t]he agreement between the parties, including any documents, oral statements, course of performance, or other evidence of its existence, and any ambiguity in the terms."  SMF ¶ 15.  Mr. Jones testified that the written agreement between the parties relating to the Software is comprised by a 2008 EULA and a 2011 Purchase Order.  SMF ¶ 16.  Mr. Jones agreed that the EULA is the document marked as Actian's Deposition Exhibit 1043, SMF ¶ 17, and the 2011 Purchase Order was the document marked as Actian's Deposition Exhibit 1090, SMF ¶ 18.

The EULA provides that it is the "complete agreement concerning the subject matter" between "your company" and Actian and "supersedes all prior agreements and representations" between the parties.  SMF ¶ 25.  It further provides that it "may be amended only in writing executed by both parties."  SMF ¶ 26.  Nonetheless, Plaintiffs' 30(b)(6) witness on the topic of Plaintiffs' performance under the relevant agreement or license, Robert Ledford, was not aware of any communications that would have altered the terms of the EULA.  SMF ¶¶ 20 and 21.

2.  **VDS Breached the Terms of the EULA**

The EULA is governed by Texas law.  SMF ¶ 27.  Under Texas law, "the elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tender of performance; (3) breach by the defendant; and (4) damages resulting from the breach."  *Tiras v. Bailey Props., L.L.C.*, 659 F. App'x 753, 756 (5th Cir. 2016), citing *Oliphant Fin., LLC v. Galaviz*, 299 S.W.3d 829, 834 (Tex. App.—Dallas 2009, no pet.). The EULA is a valid contract that VDS entered into in installing the Software.  Actian fully performed under the EULA by delivering copies of the Software, SMF ¶ 34.

### i.    The EULA is a Valid Contract that VDS Entered Into During Installation of the Software

There can be no dispute that VDS personnel installed multiple copies of the Software, and in so doing accepted the terms of the EULA on behalf of their company. The EULA contains an audit provision that obligates a licensee to maintain sufficient records to document their use of the Software, and allows Actian to audit such records on reasonable notice.  SMF ¶ 33.  Pursuant to this provision, Actian requested that VDS complete an audit form in late 2020.  SMF ¶ 35. VDS filled out and returned the audit form, showing installation and use of Version 9.2 of the Software for approximately twelve users on 21 unique hosts.  SMF ¶¶ 38-41.  VDS confirmed that the results of the audit were accurate.  SMF ¶ 39.  There can be no dispute that VDS installed multiple copies of the Software on multiple host computers.

There is also no dispute that these copies of the Software could not have been installed without accepting the EULA. SMF ¶ 22.  Indeed, VDS employee Charles "Josh" Johnson testified that he installed the Software on at least several of the hosts computers, and in so doing would have agreed to the terms of the EULA if it was required to do the install.  SMF ¶¶ 23 and 24. Additionally, VDS contends that it holds license rights to use the Software. SMF ¶ 5. This is only possible if it accepted the terms of the EULA.

Accepting an end-user license agreement creates a valid and enforceable contract under Texas law.  *See Rutkoski v. Evolv Health, LLC*, 05-17-00088-cv, 2019 WL 101209f at *15 (Tex. App. -Dallas Mar. 4, 2019, judgment set aside, opinion not vacated, 05-17, 05-17-00088-cv, 2019 WL 1071838 (Tex. App. – Dallas Mar. 7, 2019), no pet.); *Reversion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 782-83 (N.D. Tex. 2006) (clickwrap licenses are valid and enforceable on company when user accepts, collecting cases). Indeed, Plaintiffs

7

sued Actian for declaratory judgment that VDS's use of the Software was and is within the use licensed by Actian and that VDS and Covetrus had not infringed any copyright owned by Actian. SMF ¶ 6.

### ii.    Actian Fully Performed Under the EULA

The Purchase Order obligated Actian to provide the Software to VDS. SMF ¶ 34. There is no dispute that Actian provided the Software to VDS and that VDS was able to use the software. SMF ¶ 9. Thus, Plaintiffs cannot point to any non-performance by Actian that would excuse any breach.

### iii.    VDS Breached Section 6 of the EULA by Using the Software to Provide Computer Services to Third Party Veterinary Offices and PIMS Vendors

Section 6 of the EULA states that: "You may not use, access, or allow access to the Software in any manner to provide service bureau, ASP, time-sharing, or other computer services to third parties without prior approval of Pervasive." SMF ¶ 32. Yet, VDS's primary use of the Software was doing exactly what was prohibited: providing computer services to two sets of third parties, one on the source code and the other on the target side. As discussed below, on the source side, VDS used the Software to ingest the data of third-party veterinary offices who were looking to migrate their old data to new systems, known as "practice information management systems". There, the Software was used to move the data from the old customer system into an intermediate data structure for further processing. Then, on the target side, the Software was used to load the data from the intermediate data structure into the third-party PIMS vendors' systems to be used going forward. In this way, VDS helped third party vet offices move their old data into new PIMS systems operated by other third parties, essentially acting as a middleman

8

between the vet offices, who were looking to upgrade their systems, and PIMS vendors who were looking to get new vet office customers.

In particular, VDS admits that it is in the business of "providing data integration, conversion, and support services to practice information management systems ('PIMS') vendors that serve the veterinary industry." SMF ¶ 7. VDS admits that it uses the Software "for its conversion service: where it maps historical data from veterinary office computer systems, moves that data into VDS's system, and reconfigures the data for use going forward with practice information management systems ('PIMS')." SMF ¶ 9. Robert Ledford, Plaintiffs' 30(b)(6) witness on use of the Software, confirmed that VDS used the Software "to access the original source PIMS that a customer or practice was looking to migrate from, load it into an intermediary data structure that was standardized and then from there pick it up from that intermediary data structure and load it into the target structure for the PIMS customer that had requested the conversion." SUF ¶¶ 11 and 20. The audit results confirmed this as well, showing that VDS was using the Software to host or support various customers, that VDS was using the Software's maps/processes to migrate individual concepts of one system to an intermediate database, and using the Software's maps/processes to move from the intermediate database to the format its clients expect. SMF ¶¶ 45-48.

In sum, Plaintiffs do not dispute that VDS was using the Software to provide conversion services for third-party vet offices, and to third-party PIMS clients. Instead, they contend that "at no time in any conversion was any third party allowed to use the Software other than VDS's employees, and the Software was never put on a veterinary practice's platform or on an external PiMS vendor's platform." SMF ¶ 14. But this argument fails as a matter of law because it rests on an untenable interpretation of the Agreement, in which VDS is only prohibited from giving a

third-party direct access to the Software.  The plain language of the provision prohibits the licensee from using the Software to provide computer services to third parties.  VDS's interpretation focuses on the provision prohibiting "allowing access to the Software…to third parties", but this interpretation would eliminate the other two prohibitions: using or accessing "the Software in any manner to provide … computer services to third parties without prior approval."  This cannot be correct, because Under Texas law, an interpretation of a contract that eliminates language is precluded as a matter of law.  *R&P Enters. v. La Guarta*, 596 S.W. 2d 517, 518, 519 (Texas 1980) (Court construes the entire instrument so no provision will be rendered meaningless); *Coker v. Coker*, 650 S.W. 2d 391, 393 (Texas 1983) (courts should consider the entire writing to harmonize and give effect to all its provisions so none is rendered meaningless).

In fact, a Texas court has already interpreted the EULA language at issue here and determined that similar by a different Actian licensee conduct is a breach.  In the case *OmniSYS, LLC v. Actian Corporation*, Cause No. DC-18-09789 (Dist. Ct., Dallas County, Texas), the Texas court granted summary judgment in favor of Actian that licensee OmniSYS violated the EULA provision that "You may not use, access, or allow access to the Software in any manner to provide service bureau, ASP, time-sharing, or other computer services to third parties without prior written approval of Pervasive." SMF ¶ 52.  There, the Actian licensee used the software "in one step of the pharmacy billing function within CareCLAIM whereby data is changed from the NCPDP format to ANSI X12 *and ultimately electronic bills are submitted to payors on behalf of the pharmacies*."  SMF ¶ 53.  Similarly, here Plaintiffs do not dispute that VDS was using the Software to provide conversion services for third-party vet offices, and to third-party PIMS clients.

### iv.     <u>Additionally and In the Alternative, VDS Breached Section 1 of the EULA by Over-Deploying the Software</u>

Section 1A of the EULA provides that, for design or development editions of the Software, "You may install the Software only in a single location on a hard disk or other storage device" and "You may install the Software on a network server used only to install or run the Software over an internal network; however, you must acquire and dedicate a license for each individual who will use the Software." SMF ¶ 28. For deployment or runtime editions of the Software, Section 1B of the EULA provides that "[e]ach license of the deployment or runtime Software may be installed only on a single machine or network server" and "[o]n multiple-CPU machines, the deployment or runtime Software may not be used concurrently on more CPUs than the number of CPUs specified on the media package or sales invoice." SMF ¶ 29. It further provides that "[i]n the event you use any number of physical CPUs, the authorized number of CPUs under this Agreement will be determined based on the number of logical or virtual CPUs." *Id*.

In the 2011 Purchase Order, VDS purchased a license to use a single copy of Design Edition of the Software, single copy of Professional Edition of the Software, and single copies of software maintenance to each of those. SMF ¶ 19. In the Audit, VDS reported that the license provided for three users and three CPUs. SMF ¶ 41. Yet, the same results show that VDS was using the Software for approximately twelve users, on distributing to twenty-one host computers, across 112 total cores. SMF ¶¶ 42-44. Of those twenty-one host computers storing and running copies of Software, VDS described fifteen as "Development" environments, and six as "Test / QA" environments. SMF ¶ 49. As such, the restrictions of Section 1A apply to all copies,

meaning that VDS was permitted to install the Software only in a single location on either a hard disk, other storage device, or on an internal network server.

The audit results therefore confirm numerous over-deployments – unlicensed uses and unauthorized reproductions and distributions of the Software. First, of the twenty-one host computers, twelve were installed on "AzureVM", which is an *external* Microsoft environment, not an *internal* network server. SMF ¶¶ 50 and 57. Actian never licensed to any Plaintiff the right to distribute any Software, which was prohibited by Section 4 of the EULA. SMF ¶¶ 51 and 31.

Second, based on the self-audit results, VDS exceeded the licensed number of users by at least nine users, having *three* licensed users compared to *twelve* actual users, and VDS exceeded the number licensed cores by 109, having *three* licensed cores/CPUs versus *112* actual cores/CPUs. Third, and making matters even worse, forensic examination of the computer images produced by Plaintiffs revealed *42 additional cores* running the copies of all or part of the Software on *nine additional* computer systems, neither of which did Plaintiffs report in the self-audit. SMF, ¶ 58. There can be no dispute that Plaintiffs reproduced and distributed unlicensed copies of the Software exceeding the quantity (one) that Actian had licensed to them.

These significant over-deployments are not surprising given that Chauncey Fannin, Senior Manager of Operations at VDS and thereafter Covetrus, testified that when he began managing the data conversion team in February of 2018, there was no policy in place, as far as he was aware, to ensure that software being used was properly licensed. SMF ¶ 61. There was no effort to track the number of installations of software that was used for conversions. SMF ¶ 62. There was no effort to control the number of copies of the Software installed or how many users were using it. SMF ¶ 63. And there was no effort to control the deployment of the Software within the data conversion team. SMF ¶ 64. As manager of the data conversion team, Mr.

Fannin was not even aware of the Agreement that governed Plaintiffs' use of the Software.  SMF ¶ 65.

Similarly, Josh Johnson confirmed that there was no process at VDS to keep track of what was licensed for the Software and that he did not know if there was a process at Covetrus to keep track of what was licensed for the Software.  SMF ¶ 66.  When he installed the Software on virtual machines, there was no process to ensure that the activity was licensed, other than copying and applying the license file when installing a copy of the Software on a computer.  SMF ¶ 67.  He testified that at the time of his departure, there were "around twenty-something" copies of Data Integrator at VDS.  SMF ¶ 68.  Applying the properly construed Agreement to these facts, there is no material issue of fact that VDS breached the Agreement by over-deploying the Software, and that habitually reproduced many copies without license, distributed them internally, and distributed them to third parties including Microsoft for use in its Azure service.

### v.    Actian Suffered Damages Resulting From VDS's Breaches

The fourth and final element of breach of contract under Texas law is "damages resulting from the breach."  *Tiras*, 659 F. App'x at 756 (5th Cir. 2016).  Just as the facts showing VDS's breaches of the Agreement are not in dispute, there is no question of fact that those breaches have caused Actian to suffer damages.  Courts regularly grant summary judgment on liability for breach of contract where there is material dispute that some damages have occurred and reserve the issue of the amount of damages for trial.  *See Aquila, LLC v. City of Bangor*, 640 F. Supp. 2d 92, 99 (D. Maine 2009) (entering summary judgment of liability for breach of contract, leaving amount of damages for trial); *Jenny B. Realty, LLC v. Danielson, LLC*, 456 F. Supp. 3d 307, 317 (D. Mass. 2020) (granting summary judgment on breach of contract but not damages); *Princeton*

*Excess & Surplus Lines Ins. Co. v. R.I. Cranston Ent. Inc.*, 2024 U.S. Dist. LEXIS 53592, at *38 (D.R.I. March 26, 2024).

There is no question that VDS's breaches have caused damage to Actian in several ways. First, the breach of Section 6 of the Agreement, prohibiting using the Software to provide computer services to third parties, injured Actian by depriving it of licensing revenue it would have received for the cost of the commercial license VDS should have purchased to cover that commercial use of the Software. Actian's Heather Bradberry testified that Actian's commercial license, also called a "partner license," is different from a EULA and provides additional rights compared to the EULA. SMF ¶ 69. And Actian's Marc Potter testified that under a commercial license, a partner can use the Software to provide services to its customers, and "they pay a premium for that." SMF ¶ 79. Additionally, the EULA prohibits distribution of copies of the Software, which would require a distribution license. SMF ¶ 31.

Texas law allows those harmed by a breach of contract to recover, inter alia, expectation damages, "the amount necessary to place [the non-breaching party] in the position it would have occupied if the contract had been performed," *Range v. Calvary Christian Fellowship*, 530 S.W. 3d 818, 831 (Tex. App. 2017) or restitution damages, which "restore to the [non-breaching party] a benefit that it had conferred on the [breaching party]. *Atrium Med. Ctr. LP v. Houston Red C LLC*, 595 S.W. 3d 188, 193 (Tex. 2020). So Actian's damages could be calculated as the difference between the cost of the end user license VDS actually purchased and the fair market cost of the commercial license, and the distribution license, that it should have purchased in order to be licensed to use the Software for conversions for third parties. *See, e.g. Medical Coll. of Wisconsin, Inc. v. Attachmate Corp.*, No. 15-CV-151-JPS, 2016 U.S. Dist. LEXIS 20462,

2016 WL at *16 (E.D. Wis. Feb. 19, 2016) (finding that plaintiff was entitled to lost license fees resulting from breach).

Second, Plaintiffs also injured Actian by supplying the market with computer services that depend on the Software, when Actian had charged VDS less than it would have charged for a commercial license because VDS agreed to refrain from supplying such services to third parties.

Third, by not paying for a license for each individual user who had the Software on a laptop for use on conversions, VDS deprived Actian of licensing revenue it would have received if VDS had paid for those licenses, as the Agreement required.  Reasonable fact finders could potentially disagree about the amount of damages Actian sustained as a result of the breaches of the Agreement, but there is no scenario in which the breaches were harmless to Actian.  Thus, the last element of breach of contract has been established.

**B.  Summary Judgment Should Be Entered in Favor of Actian That VDS Has Infringed Actian's Copyrights in the Software**

Summary judgment should also be entered in Actian's favor on Plaintiffs' second request for a declaration, that they "have not infringed any copyright owned by Actian." Dkt. 38 at ¶ 49. To establish copyright infringement, a plaintiff must prove two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of a work that are original.  *Society of Holy Transfig. Monastery Inc. v. Gregory*, 689 F.3d 29, 39 (1st Cir. 2012).

As to element (1), a certificate of copyright registration "constitutes prima facie evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid." *Saenger Org. v. Nationwide Ins. Licensing Assocs.*, 119 F.3d 55, 59 (1st Cir. 1997); *see also Johnson v. Gordon*, 409 F.3d 12, 17 (1st Cir. 2005).  Actian is the owner of copyrights in

the Software, which are registered under Copyright Registration Nos. TX0008902355, TX0008902344, TX0008902360, TX0008902319, TX0008898417, TX0008899134, TX0009058230, TX0009058232, TX0009260777, TX0009260366, and TX0009260358 (collectively, the "Copyrights").  SMF ¶ 71.  Based on these registrations, the burden shifts to Plaintiffs to demonstrate why Actian's Copyrights are not valid.  Previously in this action, Plaintiffs filed two motions attacking the validity of Actian's copyrights under 17 U.S.C. § 411, both of which were denied by the Court.  Dkt. 184. Plaintiffs have not filed any additional motion to invalidate any of the Copyrights, and even if they did, cannot meet the burden of showing invalidity under the Copyright statute.

As to element (2), a licensor (i.e. Actian) may show copyright infringement against a licensee (i.e. Plaintiffs) if a license is exceeded or the agreement governing use of the software is breached.  *Tasini v. New York Times Co.*, 206 F.3d 161, 170, 187 (2d Cir. 2000) *aff'd*, 553 U.S. 483 (2001).  Thus, the breaches discussed above also constitute copyright infringement.

In particular, as discussed above, VDS infringed Actian's copyrights by using the Software to provide computer services to third party veterinary offices and PIMS vendors, outside the scope of Section 6 of the EULA.  SMF ¶¶ 41-49, and 58.  Additionally, VDS also infringed Actian's copyrights in the Software by (1) reproducing and distributing at least twelve copies of the Software to a third party, Microsoft Corporation, for use in its "Azure VM" service, not an *internal* network server (SMF ¶¶ 50 and 57); exceeding the licensed number of users by at least *nine users*, having *three* licensed users compared to *twelve* actual users (SMF ¶¶ 41 and 42); (3) exceeding the number licensed cores by 109, having *three* licensed cores/CPUs versus *112* actual cores/CPUs (SMF ¶¶ 41 and 44); and (4) deploying the Software on at least *42 additional cores* running the Software on *nine additional* systems, none of which had been

16

reported in the self-audit (SMF ¶ 58).  These unauthorized reproductions, distributions and unlicensed uses of copies of Software that Defendant had licensed to VDS constitute copyright infringement.  *See Small Bus. Bodyguard, Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 305 (S.D.N.Y. 2017) (licensee that used a copyrighted work in a manner or extent not authorized by its license infringed the copyright).  Therefore, the undisputed facts show that Actian is entitled to summary judgment that VDS has infringed its copyrights in the Software.

## C.  Summary Judgment Should Be Entered in Favor of Actian That Covetrus Has Infringed Actian's Copyrights in the Software

Substantial facts elicited in discovery support the finding that Covetrus was a direct or at least an indirect infringer of Actian's Copyrights.  One infringes contributorily by intentionally inducing or encouraging direct infringement and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.  *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S. Ct. 2764, 2776 (2005).  Covetrus is liable for contributory copyright infringement because it intentionally induced and encouraged VDS' direct infringement.  Covetrus is also liable for vicarious infringement because it profited from VDS' direct infringement while declining to exercise a right to stop or limit it.

For example, Covetrus took responsibility to pay for the Actian Software, with Sales Orders directing that bills to VDS to be sent to a Maine Address that is identical to that of Covetrus.  SMF ¶ 72.  Covetrus employees were directly, substantially and continuously involved in the process of negotiating for the procurement of software to be ostensibly used by VDS, and likely Covetrus as well, and such Covetrus employees that were in essence running VDS' operations.  SMF ¶ 73.  VDS employees who were formerly involved with interactions with Actian, including but not limited to Chauncey Fannin and Josh Johnson, have quit VDS,

17

been fired by VDS, or are otherwise no longer working for VDS, and their job responsibilities have been transferred to Covetrus employees. SMF ¶ 74. For example, when Actian sent a self-audit to VDS, the self-audit response by VDS to Actian was managed and handled by Covetrus employee Kristen Parisien (Kristen.Parisien@covetrus.com), rather than any employee of VDS. SMF ¶ 75. Supposed employees of VDS also have Covetrus email addresses. SMF ¶ 76.

And this is not all. In its annual reports, Covetrus represents to investors that it provides "data integrations" including "data conversions," which is the *same* service that VDS was providing using Actian's Data Connect software. SMF ¶ 77. Covetrus also represented to third parties that it is the "successor-in-interest to Veterinary Data Services, Inc.," and referred such third parties who had previously interacted directly with VDS to interact with Covetrus employees. SMF ¶ 78. VDS's "Meet the Team" website lists employees who represent to the public that they are employees of "Covetrus." SMF ¶ 79. Covetrus has posted jobs and is actively recruiting employees to work in the Lexington, KY area where VDS claims to be located, indicating that VDS' operations are in fact being managed by none other than Covetrus. SMF ¶ 80. VDS' website at vetdata.com represents that Covetrus products are their own stating, e.g., "We Build the Tools for the Vet Industry," referencing a product called "Covetrus Connect Marketplace." SMF ¶ 81. Covetrus has had a direct financial interest in the infringement and has profited substantially from the infringement, which has included use of the Actian Software to convert data into target PIMS of which Covetrus owns several, including AVImark, ImproMedCovetrus, and eVetPractice in the U.S., and RxWorks and RoboVet outside the U.S. SMF ¶ 82.

Covetrus has derived revenues from the infringement, including but not limited to revenues from licensing the PIMS, and by monetizing the converted data in the PIMS. Covetrus

18

has monetized the converted PIMS data, for example, by offering a "Covetrus Global Rx Management" prescription management application provided on the Covetrus Connect Marketplace Covetrus also benefited from the infringement, through free or reduced-price conversions offered in exchange for access to the converted PIMS data. SMF ¶ 82. Covetrus had knowledge of the infringement. SMF ¶ 82. For example, Covetrus' employees directly managed and controlled the conversions and the employees of VDS who were involved in the conversions; Covetrus provided finance, legal, management, information technology, and other services on behalf of VDS; Covetrus or Covetrus-owned entities were parties to conversion-services contracts; and Covetrus managed and was substantially involved with collecting data regarding use of the Software. *Id*. Covetrus represented that there is "nothing to inspect" in VDS's physical office location in Lexington, Kentucky, and has represented that the VDS office in Kentucky is an "empty office." SMF ¶ 84. And Covetrus employees testified on behalf of VDS in a corporate capacity. SMF ¶ 85. The foregoing facts also support Covetrus liable for indirectly infringing Actian's copyrights, including contributory infringement and vicarious copyright liability.

In the alternative, Actian is entitled to summary judgment that plaintiff Covetrus is liable for copyright infringement because the corporate veil should be pierced and Covetrus should be found liable for acts it attributes to VDS. VDS became a subsidiary of Covetrus in 2019. SMF ¶ 89. A parent corporation such as Covetrus may be held liable for the wrongful conduct of a subsidiary such as VDS "when, inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes." *Frontier Communs. Corp. v. Barrett Paving Materials, Inc.*, No. 07-113-B-S, 2009 U.S. Dist. LEXIS 80474, at *36-38 (D. Me. Aug. 14, 2009), citing *United States v. Bestfoods*, 524 U.S. 51, 63, 118 S. Ct. 1876, 1885 (1998). Here, Plaintiffs are

misusing the corporate form by attempting to cabin liability for breach of contract and infringement in the subsidiary VDS, which it claims has negative profits, while at the same time diverting VDS' revenues to Covetrus, which reports billions of dollars in revenue.

In particular, VDS, through its expert Landon Ansell, claims to have a negative operating profit margin for the period of January 2015 through November 2021, indicating that the company had no profits.  SMF ¶ 86.  At the same time, Covetrus reported revenue of $2.377 billion for the year ending December 31st, 2020.  SMF ¶ 87.  Covetrus' substantial revenues were obtained at least in part from the data conversions that were performed using the Software.  SMF ¶ 88.  It would be unjust to allow Covetrus to siphon off the revenues from VDS' data conversions, which were performed using the Software in violation of the EULA and by infringing Actian's Copyrights, while at the same time arguing that VDS has negative operating profit margin and lack of profits.

## V.    **CONCLUSION**

For the foregoing reasons, Actian respectfully requests that the Court grant its motion for summary judgment.


Dated: May 16, 2025                                   Respectfully submitted,

                                                      /s/ Ryan E. Hatch
                                                      Ryan E. Hatch
                                                      Hatch Law, PC
                                                      13323 W. Washington Blvd., Suite 302
                                                      Los Angeles, CA 90066
                                                      Telephone: (310) 279-5076
                                                      ryan@hatchlaw.com

                                                      James B. Haddow, Esq.
                                                      Petruccelli, Martin & Haddow LLP
                                                      Two Monument Square, Suite 900
                                                      Portland, Maine 04112-8555
                                                      Telephone: 207-253-6417

jhaddow@pmhlegal.com

Alan D. Sege (SBN 177350)
13323 Washington Blvd., Suite 302
Los Angeles, California 90066
Telephone: (310) 957-3301
alan@alansege.com

*Attorneys for Defendant and Counterclaim*
*Plaintiff Actian Corporation*

21

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 16, 2025, Defendant served Actian's ***MOTION FOR SUMMARY JUDGMENT OF BREACH OF CONTRACT AND COPYRIGHT INFRINGEMENT*** on Plaintiffs Veterinary Data Services and Covetrus, Inc. Service was sent via electronic mail to the following counsel for Veterinary Data Services, Inc., and Covetrus, Inc.

| | |
|---|---|
| Paul McDonald<br>BERNSTEIN SHUR<br>100 Middle Street, P.O. Box 9729<br>pmcdonald@bernsteinshur.com | Danielle J. Healey<br>SPENCER FANE LLP<br>3040 Post Oak Blvd, Suite 1300<br>Houston, TX 77056<br>dhealy@spencerfane.com<br><br>Stephen J. Zralek<br>SPENCER FANE LLP<br>511 Union Street, Suite 1600<br>Nashville, TN 37219<br>Telephone: (615) 238-6305<br>Email: szralek@spencerfane.com |

*/s/ Ryan Hatch*
Ryan Hatch