**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| COVETRUS, INC. and VETERINARY DATA SERVICES, INC., <br><br>       Plaintiffs/Counterclaim Defendants, <br><br>       v. <br><br> ACTIAN CORPORATION, <br><br>       Defendant/Counterclaim Plaintiff. | Civil Action No. 2:21-cv-00097-SDN |

## PLAINTIFFS' CORRECTED MOTION FOR SUMMARY JUDGMENT ON BREACH OF CONTRACT AND COPYRIGHT INFRINGEMENT

Pursuant to Local Rule 56 and Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Covetrus, Inc. ("Covetrus") and Veterinary Data Services, Inc. ("VDS") file this Motion for Summary Judgment on Actian Corporation's claims for breach of contract and copyright infringement. As set forth below and in Covetrus and VDS's Supporting Statement of Material Facts, Plaintiffs are entitled to summary judgment because the counterclaims asserted by Actian Corporation ("Actian") are barred in whole or in part by the applicable statutes of limitations; because Actian cannot meet its burden to prove breach of contract or copyright infringement; and because if Actian's claims do survive, the Court must construe key disputed terms as a matter of law. There is no genuine dispute as to any material facts relevant to disposition of Actian's claims as applicable to the grounds and arguments in this Motion.

# Table of Contents

I.      INTRODUCTION ........................................................................................................... 1

II.     Background ..................................................................................................................... 1

III.    LEGAL STANDARDS .................................................................................................. 6

IV.     ARGUMENTS AND AUTHORITIES............................................................................ 7

        A. Actian's Counterclaims are Barred by Statutes of Limitations. ................................ 7

            1.   Actian's Breach of Contract Claims are Barred by a Six-Year Statute of
                 Limitations. .......................................................................................................... 7

            2.   Actian's Copyright Infringement Claims are Limited by a Three-Year Rolling
                 Statute of Limitations............................................................................................ 9

        B. Actian Has No Admissible Evidence of Infringement. ........................................... 13

        C. Covetrus Should be Dismissed as a Counter-Defendant. ........................................ 15

            1.   Actian has No Evidence that Covetrus is the Alter Ego of VDS...................... 15

            2.   Covetrus Was Not a Direct Participant in the Alleged Breach or Infringement.17

            3.   Covetrus is entitled to Summary Judgment on Secondary (Indirect)
                 Infringement: Contributory and Vicarious Infringement................................... 19

        D. Plaintiffs Move to Resolve the Key Legal Issues of Contract Interpretation. ......... 20

            1.   The Version 9 EULA is the Entire Agreement Between Actian and VDS. ...... 21

            2.   The Version 9 EULA Did Not Require Maintenance and Support Services..... 26

            3.   The Version 9 EULA Does Not Define "Commercial" Use. ........................... 26

            4.   The Version 9 EULA does not measured use by "cores.".................................. 27

        E. Actian's Copyright Infringement Claims Fail as a Matter of Law—The
           Registrations Are Not Prima Facie Evidence of Validity....................................... 27

        F. Actian is Not Entitled to Statutory Damages or Attorneys' Fees. ........................... 33

V.      CONCLUSION............................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airframe Sys., Inc. v. L-3 Commc'ns Corp.*,
  658 F.3d 100 (1st Cir. 2011)..............................................................................................27, 28

*Aquarian Found., Inc. v. Lowndes*,
  127 F.4th 814 (9th Cir. 2025) ..................................................................................................26

*Barnes v. Forest Hills Inv., Inc.*,
  11 F.Supp.2d 699 (E.D. Tex. 1998)..........................................................................................23

*Biko v. Siemens Corp.*,
  246 S.W.3d 148 (Tex. App.—Dallas 2007, pet. denied).........................................................21

*Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*,
  409 S.W.3d 181 (Tex. App.—Dallas 2013)..............................................................................23

*Bryan v. Hum. Power of N Co.*,
  No. 03-22-00632-CV, 2024 WL 734654 (Tex. App.—Austin Feb. 23, 2024,
  review denied)....................................................................................................................21, 25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986),..................................................................................................................6

*Citibank, N.A. v. East 65th Street Owners LLC*,
  No. 651089/2019, 2023 WL 7002756 (N.Y. Sup. Ct. Oct. 24, 2023) .....................................17

*COC Servs., Ltd. v. CompUSA, Inc.*,
  150 S.W.3d 654 (Tex. App—Dallas 2004, pet. denied)...........................................................21

*Covetrus Inc. v. Actian Corp.*,
  2022 WL 179838 (D. M.E. Jan. 20, 2022) ...............................................................................15

*Dynamic Sols. Inc. v. Planning & Control, Inc.*,
  646 F.Supp. 1329 (S.D.N.Y. 1986) ..........................................................................................32

*Erlich v. Ouellette, Labonte, Roberge and Allen, P.A.*,
  637 F.3d 32 (1st Cir. 2011)........................................................................................................8

*Esmark, Inc. v. N.L.R.B.*,
  887 F.2d 739 (7th Cir. 1989) ..............................................................................................15, 17

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)..................................................................................................................28

*Feliciano-Munoz v. Rebarber-Ocasio*,
   970 F.3d 53 (1st Cir. 2020) ..................................................................................6, 7, 17

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
   586 U.S. 296 (2019) ..................................................................................................27

*Garside v. Osco Drug, Inc.*,
   895 F.2d 46 (1st Cir. 1990) ........................................................................................6

*In re C Tek Software, Inc.*,
   127 B.R. 501, 506-07 (D. N.H. 1991) ......................................................................32

*In re Freightquote.com*,
   No. 05-18-01028-CV, 2019 WL 995791 (Tex. App.—Dallas Mar. 1, 2019) .........23

*Jarvis v. K2 Inc.*,
   486 F.3d 526 (9th Cir. 2007) ....................................................................................26

*Johnson v. Gordon*,
   409 F.3d 12 (1st Cir. 2005) .................................................................................28, 31

*Kern v. Sitel Corp.*,
   517 F.3d 306 (5th Cir. 2008) ....................................................................................21

*Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*,
   31 F.2d 265 (2d Cir. 1929) .......................................................................................17

*Latin Am. Music Co. Inc. v. Media Power Grp., Inc.*,
   705 F.3d 34 (1st Cir. 2013) .......................................................................................28

*Lookshin v Union Planters Bank*,
   2006 WL 3147330 (S.D. Tex. Oct. 30, 2006) ..........................................................21

*Lotus Dev. Corp. v. Borland Int'l, Inc.*,
   49 F.3d 807 (1st Cir. 1995), *affirmed*, 526 U.S. 233 (1996) .............................32, 33

*McCarthy v. Nw. Airlines, Inc.*,
   56 F.3d 313 (1st Cir. 1995) .........................................................................................7

*Mesenbring v. Rollins, Inc.*,
   105 F.4th 981 (7th Cir. 2024) ...............................................................................17, 18

*Mesnick v. General Elec. Co.*,
   950 F.2d 816 (1st Cir. 1991) .......................................................................................6

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) ..................................................................................................19

*Montgomery v. Noga*,
   168 F.3d 1282 (11th Cir. 1999) .................................................................................14, 31, 33

*Pearson v. Component Tech. Corp.*,
   247 F.3d 471 (3d Cir. 2001).................................................................................................17

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
   572 U.S. 663 (2014)...............................................................................................................9

*Prado Alvarez v. R.J. Reynolds Tobacco Co.*,
   405 F.3d 36 (1st Cir. 2005).....................................................................................................7

*Reed Elsevier, Inc. v. Muchnick*,
   559 U.S. 154 (2010).............................................................................................................27

*Shebley v. United Continental Holdings, Inc.*,
   2023 WL 6388248 (N.D. Ill. Sept. 20, 2023) .................................................................15, 16

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*,
   642 F.Supp. 206 (S.D.N.Y. 2009) .......................................................................................14

*Situation Mgmt. Sys., Inc. v. ASP Consulting LLC*,
   560 F.3d 53 (1st Cir. 2009)...................................................................................................28

*Stine v. Stewart*,
   80 S.W.3d 586 (Tex. 2002)....................................................................................................7

*Super Sulky, Inc. v. U.S. Trotting Ass'n*,
   174 F.3d 733 (6th Cir. 1999) ..................................................................................................7

*Tornesello v. Tisdale*,
   2008 ME 84, 948 A.2d 1244 (2015) ...................................................................................7, 8

*U.S. v. Bestfoods*,
   524 U.S. 51 (1998)...........................................................................................................15, 18

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
   752 A.2d 1175 (Del. Ch. 1999).............................................................................................16

*Warner Chappell Music, Inc. v. Nealy*,
   601 U.S. 366 ...........................................................................................................................9

*Warren Freedenfeld Assocs., Inc. v. McTigue*,
   531 F.3d 38 (1st Cir. 2008).....................................................................................................9

*Wenske v. Blue Bell Creameries, Inc.*,
   No. 2017-0699, 2018 WL 3337531, at *15 (Del. Ch. 2018))................................................16

*Woltersdorf v. Desrochers*,
2006 WL 344762 ...................................................................................................................13

## I.    INTRODUCTION

For the reasons set forth below, both of Actian's Counterclaims fail as a matter of law, and the Court should enter Declaratory Judgment in favor of Plaintiffs.

## II.    BACKGROUND

VDS provides data services in the veterinary industry and is one of the many companies that provides integration, conversion, and support services. (Plaintiffs' Support Statement of Material Facts ("SOF") ¶ 1). As part of those services, VDS converts veterinary clinic data from its customers migrating from one computer system to another, typically between Practice Information Management Systems ("PIMS"), subscription services that allow users to access numerous services to streamline their practice functions.  (SOF ¶ 2).

This case centers on allegations of breach of contract and copyright infringement based on the Version 9.0 End User License Agreement ("EULA") dated 2008. In 2006, VDS was a start-up and ordered a single user license of Version 8.12 of Pervasive's Data Integrator software (the "Software") and in-person training from Pervasive. (SOF ¶¶ 11, 82). The first record of a purchase of Version 9 that could be found by either party was in 2011, when VDS purchased a perpetual license for a single user Version 9.2 of the Software. (SOF ¶ 12). VDS purchased at various times maintenance and support or one or the other. At some point after 2011, VDS was upgraded to Version 9.2.7.10 of the Software. (SOF ¶ 13). According to Actian's counsel, the EULA for Version 9, dated 2008 and attached as Exhibit A to Actian's Counterclaims (Doc. 235), applies to Version 9.2.7.10 of the Software (the "Version 9 EULA"). (SOF ¶ 22).

The Version 9 EULA is provided to the user via a pop-up window during the Software installation process. (SOF ¶ 23). The pop-up license cannot be negotiated, but rather a purchaser must "click through" each screen to accept the contract in order to get the software.

1

In the same purchase order for Version 8.12, VDS also purchased training for the Software, which included three employees from VDS and one from a PIMS customer. (SOF ¶ 82). The training covered the only use VDS would ever have for the Software—converting veterinary clinic data between systems. (SOF ¶¶ 15, 83). The converted data belonged to the veterinary practice or provider, not to VDS or the PIMS. VDS used the Software for conversion services for PIMS and other customers. (SOF ¶ 15). The Software was only used by VDS employees and never third parties. (SOF ¶¶ 16-17). VDS also developed its own code for use in the conversion process, to on-board data and information from the transferor platform, which data was then converted by the Software, and then VDS's software delivered the result to the transferee platform. VDS also wrote its own code to do conversions for at least one of its PIMS customers, thus some of its conversions did not use the Software. (SOF ¶ 19).

VDS was a stand-alone, independent company until its shares were purchased in 2015 by Vet's First Choice, which held and operated VDS as an independent subsidiary. (*See* SOF ¶ 5). Covetrus became VDS's indirect parent company in February 2019 following a merger between Vet's First Choice and the veterinary health business of Henry Schein, Inc., thirteen years after VDS began using the Software. (SOF ¶¶ 5, 11-13). Covetrus was not a party to any agreements between VDS and Actian or Pervasive. (SOF ¶ 6). Covetrus has never used or been provided a copy of the Software for any purpose. (SOF ¶ 7; *see also* SOF ¶¶ 8-9). Covetrus and VDS operate as parent and subsidiary of a conglomerate typically operate, and VDS maintains its separate corporate identity. (*See e.g.*, SOF ¶¶ 3-4, 10).

Actian acquired Pervasive Software, Inc. ("Pervasive") in February 2013. At the time of Actian's acquisition of Pervasive, Pervasive had already made multiple releases of the Version 9

Software, including in 2013, Version 9.2.6.6 and 9.2.7.10 (SOF ¶ 12). Pervasive remained the licensor under the Version 9 EULA. (SOF ¶¶ 22, 31).

Both Pervasive and Actian knew how VDS used the Software. VDS had informed Pervasive on multiple occasions how it used the Software, including at in person training sessions in 2006 (SOF ¶¶ 82-85), as well as through support calls and emails in 2009 (SOF ¶¶ 39-41). Despite full awareness of VDS's decade-plus use of the Software, Pervasive did not raise any noncompliance issues and, in fact, provided support so that VDS could continue its operations as disclosed. (SOF ¶¶ 40-41, 85).

Actian also knew at least by 2017, that the Software had been deployed on at least five computers. Actian requested that VDS provide it information on how the Software was deployed and used, which VDS provided (the "2017 Audit"). (SOF ¶ 47). The 2017 Audit showed that VDS had five copies of Version 9.2.7.10 installed on five different production engines. (SOF ¶ 48). After reviewing the 2017 Audit, Actian made no allegations of breach of contract or copyright infringement, instead using the information to try to get VDS to upgrade to Version 11. (SOF ¶¶ 49-52). Numerous former Pervasive/Actian employees testified that Pervasive/Actian knew how their customers were using the Software (SOF ¶ 84, 92-93), and in fact were trying to highlight the exact use case (converting customer data into another format) in its marketing (SOF ¶ 93). Converting customer data into another format is a "common use case" of the Software. (SOF ¶ 93).

After Actian's 2013 acquisition of Pervasive, Actian put the Software "on the back burner" to focus on their own tools. (SOF ¶ 94). This included firing almost all of Pervasive's professional services group. (SOF ¶ 94). Years later, Actian "became more serious about enforcing licensing" as it changed processes and attempted to push customers to upgrade to newer versions of the

Software. (SOF ¶ 88). This included unilaterally creating a self-serving support policy that Actian has tried to force on customers without notice or novation (the "Support Policy"). (SOF ¶¶ 58-59). The only way EULA licensees were informed of the Support Policy was by reference to a link on sales orders, with no additional context. (SOF ¶¶ 54, 60-61). The 2020 Sales Order simply stated "4. ACTIAN CORPORATION SUPPORT POLICY: [LINK[1]]" without context or explanation. (Sales Order Confirmation 744697 (the "2020 Sales Order"), SOF ¶¶ 53-54). Through its newly-formed Support Policy, the earliest dated 2015, Actian unilaterally implemented a three times obsolescence fee that it forced on its customers, demanding that they pay exorbitant fees for being available to handle simple troubleshooting on versions of the Software Actian decided were old or obsolescent, but, curiously and despite the price, Actian had no obligation to fix bugs, update, or otherwise provide any specific remedy during "obsolescence." (SOF ¶¶ 62, 64). Moreover, Actian's change that it attempted to implement through its latest internet terms for maintenance and support, shortened the periods for the start of each service period, so that the highest fees on the last period of the service would start much earlier than it previously would have occurred – in effect, charging higher fees sooner.

Actian did not sign or endorse the 2020 Sales Order before sending it to VDS; after the document was returned by VDS, Actian had its VP of Finance sign it and affixed a large red stamp under his signature stating "ACTIAN LEGAL APPROVED," dated January 31, 2020. (SOF ¶ 54). Actian asserts that through the 2020 Sales Order, the Support Policy at the link bound VDS. (SOF ¶ 55). The VDS employee who signed the 2020 Sales Order, Chauncey Fannin, testified that Actian never informed him of a new support policy, nor that a routine sales order in 2020 could bind VDS to dramatically new charges to maintain the Software it had used for over a decade. (SOF ¶¶ 56-

---

[1] The Sales Order provided the following link: https://supportservices.actian.com/support-services/support#policy"https://supportservices.actian.com/support-services/support#policy

57). Following the 2020 Sales Order, Actian requested that VDS conduct a self-audit of its use of the Software, which VDS returned in early 2021 (the "2021 Audit"). (SOF ¶ 65). The 2021 Audit showed that VDS had downloaded Version 9.2.7.10 on 21 computers for 12 total users. (SOF ¶ 67). The Software populated the 2021 Audit, which shows three licenses, not one. (SOF ¶ 67).

Fifteen years after VDS started using the Software, and four years after the 2017 Audit, Actian raised allegations of over-deployment and improper use of the Software by VDS for the first time. (SOF ¶ 68). In raising such allegations, Actian claimed that VDS required multiple new "commercial licenses," rather than the Version 9 EULA license, to continue performing the same conversions as it had since 2006. According to Actian's CEO, a commercial license is a bespoke, negotiated agreement with different terms for each customer. (SOF ¶ 77). Actian also attempted to unilaterally implement a three times obsolescence fee retroactively to demand VDS pay $13.5 million based on the number of "commercial licenses" Actian contends that VDS would have purchased, at the bespoke price and terms Actian (but not VDS) said would have controlled, including maintenance and support fees Actian says VDS would have purchased. (SOF ¶¶ 68-70). As VDS's annual gross revenue for conversion services (including services rendered with and without the Software) averages less than $500,000, meaning that in the ten-year period VDS would have had revenue of about $5,000,000 for the same period Actian was demanding fees of $13.5 million. There is no reason to believe that in the bespoke "commercial license" Actian said VDS would have/should have purchased that VDS would have paid nearly 3 times its revenue. Actian made an alternative offer that VDS take a Version 11 license for $1.5 million per year, or roughly 3 times its average revenue. (SOF ¶¶ 68-70). Actian then threatened to sue VDS and its parent company, Covetrus, prompting VDS and Covetrus to file a suit for declaratory judgment on April 6, 2021. (SOF ¶¶ 71-72; *see also* Doc. 1). VDS stopped using the Software on December 31, 2021,

less than a year after Actian first raised an issue with VDS's use and about 9 months after filing its declaratory judgment action on the Version 9.x copyright registrations. (SOF ¶ 74).

In their complaint, Covetrus and VDS sought a declaration that (1) VDS had not exceeded the use of the Software licensed by Actian and therefore had not breached any contract with Actian or infringed any Actian copyright and (2) Covetrus was not a party to the Actian license and had not used the software and therefore had also not breached any contract with Actian or infringed any Actian copyright. (Doc. 38). In response, Actian asserted counterclaims for breach of contract and copyright infringement. Following several amendments to its counterclaims, Actian currently claims that Covetrus and VDS have breached the Version 9 EULA through each use of the Version 9 Software (Doc. 235, First Supplemental Counterclaim at ¶¶ 42-48) and that the same usage infringes upon eleven copyright registrations held by Actian. (SOF ¶ 96) (the "Asserted Copyrights"). All registrations occurred after the 2017 Audit, and half occurred while this litigation was pending.

## III.    LEGAL STANDARDS

"[S]ummary judgment's role is to 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). A motion for summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the burden of proving that no genuine issue of material fact exists, and the "non-moving party must respond to a properly supported motion with sufficient evidence to allow a reasonable jury to find in its favor with respect to each issue on which it has the burden of proof." *Feliciano-Munoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (citing *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986) and *Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 405 F.3d 36, 39 (1st Cir. 2005)) (internal quotations omitted). While all reasonable inferences will be drawn in favor of the non-moving party, it cannot survive summary judgment by relying on an absence of evidence, "but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *Feliciano-Munoz*, 970 F.3d at 62 (citing *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

## IV.  ARGUMENTS AND AUTHORITIES

### A.  Actian's Counterclaims are Barred by Statutes of Limitations.

#### 1.  *Actian's Breach of Contract Claims are Barred by a Six-Year Statute of Limitations.*

Actian's breach of contract counterclaim is a state law claim over which this Court can exercise jurisdiction under 28 U.S.C. § 1367. "If a federal court invokes its supplemental jurisdiction over the state-law claim, then it is 'bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction.'" *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999). This means that the Court must apply Maine's law on statutes of limitations.

In 2015, the Maine Supreme Court made clear Maine's statutes of limitations apply in Maine courts but for the exceptions in other Maine statutes. *Tornesello v. Tisdale*, 2008 ME 84, ¶ 10, 948 A.2d 1244, 1249 (2015)[2]. Maine has a general statute of limitations for all civil cases of 6 years. 14 M.R.S. § 752 (2007).[3] For purposes of applying Maine's six-year statute of limitations,

---

[2] Federal Courts in Maine have had cases where a contract between the parties had a contractual choice of law clause, but where for one reason or another, the Court found it did not apply.  No Maine cases were found on Westlaw that applied limitations based on a contractual choice of law clause.

[3] The Version 9 EULA provides that it is governed by the laws of the State of Texas (SOF ¶ 30), but because the law of the forum applies to statutes of limitations, Maine's law applies to this issue. Texas has a shorter, four-year statute of limitations for contract claims; thus, under either standard, Actian's claim is time barred. Tex. Civ. Prac. & Rem. Code § 16.051; *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002).

a breach of contract claim accrues at the time of the breach, not the time of discovery. *Id.; Erlich v. Ouellette, Labonte, Roberge and Allen, P.A.*, 637 F.3d 32, 35 (1st Cir. 2011).

In its Counterclaim, Actian alleges VDS materially breached the Version 9 EULA by installing and using the Software on more than one machine for use by more than one user. Doc. 235 at ¶¶ 26, 44(a). Since it acquired the Software in 2006, VDS has always used it on multiple machines. (SOF ¶¶ 82, 85). If multiple users is a breach of the Version 9 EULA, Actian's breach of contract claim accrued in 2006 and was time barred by 2012. Actian's damages expert assumes breach of contract and copyright damages from 2011, the year that Actian produced an invoice for purchase of perpetual licenses to 9.2. Assuming for this motion only that Actian's expert is correct that Actian's claim for breach of contract based on VDS's use of Version 9 releases arose in 2011, then it was time-barred six years later, by 2017.

Further, in its Counterclaim, Actian alleges that VDS materially breached the Version 9 EULA by using the Software for "commercial" purposes to service third-party customers and clients. Doc. 235 at ¶¶ 44(b)-(c). Since 2006, VDS has always used the Software to conduct its conversion services on customer data, including when VDS purchased its Version 9 license in 2011. (SOF ¶¶ 12-15). Notably, numerous former Pervasive/Actian employees testified that providing conversion services to third-party customers was "a common use case" for the Software known to Pervasive/Actian. (SOF ¶¶ 84, 92, 93). Accordingly, Actian's claim for breach based on VDS's use of the Software to service third-party customers and clients for "commercial" purposes is time barred and has been since 2012.

In sum, the alleged breach occurred as early as 2006 (when VDS first used the Software (Version 8.12)) (SOF ¶ 11), and certainly no later than 2011 (when VDS paid for a license to Version 9) (SOF ¶ 12). This case is a vivid example of one of the purposes of statutes of limitations,

preventing lack of access to documents that have been lost over time: neither Actian nor VDS could find any record of purchase of a Version 9 license prior to 2011 even though from service records, it is apparent that VDS upgraded to Version 9 by 2009. (SOF ¶ 39).

### 2. *Actian's Copyright Infringement Claims are Limited by a Three-Year Rolling Statute of Limitations.*

Copyright actions are governed by a three-year statute of limitations from the time a claim accrues. 17 U.S.C. § 507(b); *Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 1137 2024). Each subsequent infringement creates a separate accrual, causing a "rolling" statute of limitations. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014). Although there is a split among circuits, in the First Circuit, a claim for copyright infringement accrues "when a reasonably prudent person in the plaintiff's shoes would have discovered" the infringement. *Warren Freedenfeld Assocs., Inc. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008). "The reasonable person standard incorporates a duty of diligence." *Id.* A plaintiff cannot avoid accrual "if a reasonably diligent person, similarly situated, would have made such a discovery." *Id.* Actian should have discovered any alleged copyright infringement shortly after it occurred, under the undisputed facts here. The record shows that numerous times over a more than 15-year relationship, Pervasive/Actian had express notice of VDS's allegedly unauthorized use of the Software. (SOF ¶¶ 73, 80-95).

*Pervasive 2006 Training:* In 2006, as part of the initial purchase of the Software, Pervasive provided in-person training to Chad Amos (former owner and employee of VDS) and three other VDS employees. (SOF ¶ 82). Now nearly 20-years later, Actian alleges that VDS had only one license for one user and anything more is over deployment and unlicensed use. Yet Pervasive trained three VDS employees and one employee of a PIMS customer to use the Software on four separate machines, essentially training VDS to over deploy under Actian's unlicensed use theory. (SOF ¶ 82). On this point, Mr. Amos testified that VDS' use of the Software was "absolutely part

of the conversation during the training session, because we needed the trainer to have context for what we did in order to show us how to use the [S]oftware." (SOF ¶ 83). Pervasive knew how VDS used the Software from the very start, and if this use violated Version 8 or 9 EULA, Pervasive had notice by the early 2007 training session paid for in the late 2006 invoice. (SOF ¶ 85).

To that end, multiple former Pervasive/Actian employees testified that Pervasive/Actian knows how its customers use the Software. (*See e.g.*, SOF ¶ 84 (it was "pretty common knowledge to anybody I worked with at Pervasive, including myself" that customers used the Software to "do integration with data coming in from" third parties); SOF ¶ 92 (Pervasive/Actian salespeople "got to understand what the customer needed and what they were doing and what license would be required[.]"); SOF ¶ 93 ("[S]eems odd that anybody would get sued over" conversions for third parties because it was "a perfectly normal use case" for the Software.)).

*Pervasive 2009 Call Log:* Pervasive/Actian maintained a call log when VDS reached out to customer support. (SOF ¶ 39). On October 7, 2009, Mr. Amos called Pervasive support with a technical issue, and the Pervasive representative "[t]old him he'd have to make a separate map for *each customer*." (SOF ¶ 40 (emphasis added)). If using the Software on third-party "customer" data is unlicensed use of the Software, and thereby amounts to copyright infringement as Actian alleges, "a reasonably diligent person, similarly situated, would have" discovered VDS's alleged unlicensed use. VDS did not hide its use of the Software. On the contrary, VDS called Pervasive support for assistance in using the Software in the **exact way** Actian now alleges is unlicensed. Pervasive obliged without dispute and without raising noncompliance issues. (*See also* SOF ¶ 41 (emphasis added) (October 12, 2009 call log entry where Mr. Amos emailed Pervasive support that "[VDS] may need to downgrade to 9.0 to be compatible with one of *our clients*.")).

10

*2017 Audit:* In June 2017, Actian requested that VDS answer a questionnaire on its use of the Software for discussion of upgrading to Version 11. VDS reported on the 2017 Audit that it had five production engines of the Software deployed. (SOF ¶ 48). Heather Bradberry, a long-time Actian employee and renewal representative, reviewed the 2017 Audit in an effort to have VDS upgrade to Version 11. (SOF ¶¶ 49-50). Over the course of Actian's pitch to upgrade, VDS was fully transparent on how it used the Software, informing Actian that it could not upgrade because Version 11 did not support features in Version 9 that VDS relied on to perform its conversion services. (SOF ¶ 51). Despite VDS's full transparency, including responding in writing to questions specifically targeted at understanding how VDS used the Software (in order to push VDS to upgrade), Actian never raised any non-compliance issues before 2021. (SOF ¶ 52).

In its Counterclaim, Actian alleges that any use by VDS beyond a single user is unlicensed use, which in turn constitutes copyright infringement. Doc. 235 at ¶¶ 26, 51(a). Moreover, Actian has alleged that having the Software on more than one production platform is unlicensed. *Id.*, at ¶¶ 51(a)-(d). In at least 2017, not to mention at the 2006 training session where three employees participated in the session along with an employee of a PIMS (SOF ¶¶ 82-85), VDS explicitly informed Actian that it had the software on multiple production platforms, yet Actian said and did nothing. (SOF ¶¶ 82, 85). Actian also alleges that using the Software to assist "customers" or "clients" is unlicensed use, which in turn constitutes copyright infringement. Doc. 235 at ¶¶ 51(b)-(d). As reflected in the 2009 call logs, VDS explicitly disclosed to Pervasive multiple times its use of the Software to support "customers" or "clients." (SOF ¶¶ 39-41). Then again, in the 2017 Audit, VDS explicitly disclosed that "all environments are treated as production." (SOF ¶ 91).

As Actian agrees, providing conversion services to its customers is ***the purpose of VDS's use***. (SOF ¶¶ 1-2; *see also* Actian's Prefiling Memo. Undisputed Facts No. 4, Doc. 344, p. 4673

("VDS is in the business of providing data integration, conversion, and support services to PIMS vendors that serve the veterinary industry"), Facts Nos. 6-7, Doc. 344, 4673-4674). It is, in fact, the only reason VDS ever used the Software. (SOF ¶ 15). Numerous former Pervasive/Actian employees testified that providing conversion services to third-party customers was a known "common use case" for the Software. (SOF ¶¶ 84, 92, 93). It belies logic and, if true, shows an inherent (and willful) lack of diligence that, despite a more than 15-year relationship and an overwhelming record to the contrary, Actian had no idea how VDS used the Software until 2021. Any reasonable person would have known in 2006, or 2009, and certainly by 2017 (and many times in between).[4]

Plaintiffs filed their Complaint in April 2021. (Doc. 1). Actian counterclaimed for infringement of its copyright registration on version 9.x of the Software in its answer. Actian did not file its supplemental claim until October 19, 2023 (Doc. 235). In May 2021, Actian alleged copyright infringement of TX 8-902-355 (9.x Engine), TX 8-902-344 (9.x UI), TX 8-902-360 (10.6 Engine), TX 8-902-319 (10.6 UI), TX 8-898-417 (11.6 Engine), and 8-899-134 (11.6 UI). (Doc. 14 at ¶¶ 42-49) (The "May 2021 Copyright Claims"). In October 2023, Actian supplemented its copyright infringement claims to add TX 9-058-230 (8.12 Engine), TX 9-058-232 (8.12 UI), TX 9-260-777 (9.2.6.6 Engine), TX 9-260-366 (9.2.6.6 UI), and TX 9-260-358 (9.2.7.10 Engine). (Doc. 235 at ¶¶ 49-56) (The "October 2023 Copyright Claims").

The 2021 Copyright Claims were filed nearly four years after the 2017 disclosure of the Software being on five production platforms, which means any infringement before the rolling

---

[4] Relatedly, VDS publicly disclosed its business through its website and other means. At any point, putting aside the explicit notice provided in the record and Actian's right to audit, Actian could have discovered VDS's use by a simple internet search. A reasonably prudent person would have. Actian's former Chief Revenue Officer and current Chief Executive Officer even testified that "Unrelated [] to how VDS uses our product, Actian could become aware of the VDS model by doing a Google search." (Potter Nov. 10, 2021 Depo., Doc. 350-9 at 145:2-11).

three-year statutes of limitations going back to April 2021 are time-barred, and no damages can be sought for those claims. Actian cannot seek damages on the October 2023 Copyright Claims for any time-period prior to October 2020. Since VDS stopped using the Software on December 31, 2021, this means the damages period for Actian's infringement claims are from April 18, 2018 on its 9.x copyright and October 2020 on its 8.12, 9.2.6.6, and 9.2.7.10 copyrights. Even if Actian argues its claims all relate back to the original filing date, damages are limited to the period from April 2018 forward – three years before Plaintiffs filed suit.

### B. Actian Has No Admissible Evidence of Infringement.

A party who fails to provide information required by Rule 26(a) or (e) cannot use that information "on a motion, at a hearing, or at a trial." Fed. R. Civ. P. 37(c). Rule 26(a) required Actian to provide any documents it may use to support its claims, and Rule 26(e) required it to timely supplement its disclosures and interrogatory responses. Fed. R. Civ. P. 26(a), (e). In its Interrogatory responses since June 2022, Actian has stated that VDS received software deliveries of Version 9.2 on January 20, 2011, April 25, 2017, June 14, 2017, August 17, 2018, and January 8, 2019. (Actian's Supp. ROG Responses, ROG 21 (1/31/2025), Doc. 349-29). Plaintiffs asked Actian to supplement its interrogatory answers to show which version of 9.2, including patches or other fixes, were delivered to VDS on each date. Actian refused to do so. Actian cannot claim infringement for any version other than Version 9.2, since it refused to provide this information in its interrogatory responses.  Actian does not have a copyright on Version 9.2 or even on version 9.2.1.1. Accordingly, there is **no admissible** evidence of infringement of 9.2.6.6 or 9.2.7.10. *See, e.g., Woltersdorf v. Desrochers*, 2006 WL 344762, at *5-6 (late disclosure of information responsive to earlier interrogatories excluded when presented after the close of discovery). Relatedly, since Actian does not list Version 9.3.0.9 as ever having been delivered, and also says

in its June 2024 supplemental interrogatory answers that 9.3.0.9 was never released, there can be no infringement of the 9.3.0.9 because it was never provided to VDS. (McGrattan Depo., Doc. 350-1 at 28:2-3). Original copyrightable code can be protected by a copyright registration, but that original code can only be protected by one registration, since, once registered, the registered code is not original as to a later registration. 17 U.S.C. § 103; *see, e.g., Montgomery v. Noga*, 168 F.3d 1282, 1289-90 (11th Cir. 1999); *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F.Supp. 206, 210 (S.D.N.Y. 2009). The same is true of 9.x, as Actian does not state in its interrogatory answers that VDS ever downloaded 9.x, and there is no entry on its interrogatory response on release dates (or even completion dates) for it. (SOF ¶ 12; Actian's Supp. ROG Responses, ROG 21 (1/31/2025), Doc. 349-29; McGrattan Depo., Doc. 350-1 at 28:2-3). Actian has filed a Supplemental Registration that says 9.x is really 9.3.0.9, and that this version was not published (contrary to the 9.x registration stating the code was published).

Likewise, it is undisputed that VDS had test licenses for Version 10, Version 11, and Version 12, and likewise undisputed that VDS never upgraded to Version 10 or 11 because these new versions did not include a feature that was in Version 9, which VDS required for its business. (SOF ¶ 51). Moreover, Mr. HelfinSiegel does not present any evidence in his report, and there is no evidence in the record that VDS ever received a copy of Version 10 or 11 for production, rather than testing. *See* Doc. 355 (Motion to Exclude HelfinSiegel). Accordingly, claims for infringement

14

of any copyright on Version 10 or 11 should be dismissed because VDS never received, installed, or used production copies for Version 10 or 11.

Finally, there is no record evidence that Covetrus ever used the Software on any system of its own and no evidence that any Software was downloaded by Actian to any place other than VDS. Accordingly, any direct copyright infringement claim against Covetrus must be dismissed.

### C.    Covetrus Should be Dismissed as a Counter-Defendant.

After years of discovery, no record evidence supports maintaining Covetrus as a counter-defendant in this case. To succeed in its claims against Covetrus, Actian must prove that Covetrus is liable for VDS's actions as an alter ego or as a direct participant "in transaction-specific conduct that produces breaches of the EULA and/or copyright violations." *Covetrus Inc. v. Actian Corp.*, 2022 WL 179838, at \*5 (D. M.E. Jan. 20, 2022) (citing *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 756 (7th Cir. 1989)). Because the undisputed facts demonstrate that Actian cannot prevail against Covetrus under any theory of liability, Covetrus should be dismissed as a counter-defendant

#### 1.  *Actian has No Evidence that Covetrus is the Alter Ego of VDS*

It is a fundamental principle of corporate law, "deeply ingrained in our economic and legal systems," that a parent company is not liable for the acts of its subsidiaries. *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998). Control through ownership of shares or even through common officers and directors does not fuse the parent and subsidiary to establish liability. *Id*. at 69. "Unless the legal separateness of parent and subsidiary has been disregarded in a wide range of corporate matters," a parent will not be held liable for the actions of its subsidiary. *Esmark, Inc.,* 887 F.2d at 753. In circumstances justifying the significant equitable remedy, a party may urge a court to disregard a corporate entity by arguing for piercing the corporate veil under an alter ego theory. *Shebley v. United Continental Holdings, Inc*., 2023 WL 6388248, at \*9 (N.D. Ill. Sept. 20, 2023).

15

Covetrus is a Delaware corporation, and thus, the Court should look to Delaware law when conducting the alter ego analysis *Id*. (explaining that courts conduct the alter ego analysis with reference to the law of the state of incorporation of the entity whose corporate veil is sought to be pierced). Delaware's "alter ego theory requires that the corporate structure cause fraud or similar injustice," effectively requiring that "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Id*. (citing *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) and *Wenske v. Blue Bell Creameries, Inc.,* No. 2017-0699, 2018 WL 3337531, at \*15 (Del. Ch. 2018)).

Actian has no evidence that Covetrus existed only as a vehicle for fraud, and thus as a matter of law, Actian cannot raise a fact issue on this claim. *Shebley*, 2023 WL 6388248, at \*9 (stating that conjecture and speculation are not sufficient to raise an inference that a company is a sham). The undisputed material facts demonstrate that VDS and Covetrus operated as distinct entities – VDS controlled and directed the agreements with its customers (SOF ¶ 3), Actian invoices were paid from VDS's budget (SOF ¶ 10), Covetrus has never used the Software in any way (SOF ¶ 7), and Covetrus was not a party to any agreement with Actian or its predecessors (SOF ¶ 6). Covetrus was formed in February of 2019 when Vets First Choice and veterinary health business of Henry Schein were merged into a new entity. Vet's First Choice purchased VDS in 2015 (SOF ¶ 5), four years after Actian's expert begins his damages period, 2011.

Additionally, the record is clear that at all times Actian knew that its customer was VDS, not Covetrus. Actian sent its bills and confirmations addressed to VDS, even though it listed a Portland address for VDS (*e.g.*, Doc. 349-12), showing that Actian understood corporate separateness between parent and subsidiary companies. And the 2020 Sales Order confirmation that Actian relies on for novation was addressed to VDS, not Covetrus. (SOF ¶¶ 53-55).

16

Notably, other courts have found that equitable veil piercing remedies are not appropriate for breach of contract allegations. *See Citibank, N.A. v. East 65th Street Owners LLC*, No. 651089/2019, 2023 WL 7002756, at *6 (N.Y. Sup. Ct. Oct. 24, 2023). The court in *Citibank* stated plainly that "[b]reach of contract is not a wrong that supports veil piercing of any kind" and that "a simple breach of contract, without more, does not constitute a fraud or wrong warranting the piercing of the corporate veil[.]" *Id.* (internal citations omitted). *Id.* Here, principles of contract, not equity, should guide the analysis regarding any breach. Covetrus is not the alter ego of VDS and cannot be held liable for any purported damages in this case. *See, e.g., Feliciano-Munoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020).

### 2. *Covetrus Was Not a Direct Participant in the Alleged Breach or Infringement.*

To prevail under a direct participant theory, Actian must show that Covetrus took "immediate direction of the transaction through its officers . . . ignoring the subsidiary's paraphernalia of incorporation, directors and officers." *Esmark, Inc.,* 887 F.2d at 755-56 (quoting *Kingston Dry Dock Co. v. Lake Champlain Transp. Co*., 31 F.2d 265, 267 (2d Cir. 1929) (internal quotations omitted)); *see also Pearson v. Component Tech. Corp.,* 247 F.3d 471, 487 (3d Cir. 2001) (a parent company may be directly liable where it has "interfered with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership"). The direct participant liability theory is a narrow exception to the general rule that a parent company is not liable for the acts of its subsidiary and requires (a) that the parent company specifically direct or authorize the manner in which an activity occurs and (b) foreseeability of an injury. *Mesenbring v. Rollins, Inc*., 105 F.4th 981, 984 (7th Cir. 2024).

First, Actian cannot have evidence that Covetrus was directly involved in VDS's use before February 2019 since Covetrus did not exist at that time. Actian has no evidence that Covetrus ignored VDS's corporate formalities and directed VDS's actions related to any agreements with

Actian or the use of the Software. Indeed, the breach of contract claim was already time-barred when Covetrus was formed. Likewise, copyright infringement claims prior to February 2016, would have been time-barred if brought at the time of the merger. Merely having general control, or some similar officers and directors does not amount to a disregard of the corporate form. *See, Bestfoods*, 524 U.S. at 69-70 (it is well established "that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."); *Mesenbring*, 105 F.4th at 984 (parent's specific direction of subsidiary must be related to the complained of course of action rather than general control). To maintain this claim, Actian must produce evidence that would allow a reasonable jury to conclude that Covetrus exercised control over VDS's alleged over-deployment of the software, as well as evidence that the injury caused by Covetrus's direction of VDS was foreseeable. *Id*. Actian has none. Instead, the record reflects that VDS used the Software in the same way for over thirteen years before Covetrus was formed, and there is no evidence of any supervision or activity by Vet's First Choice or the merged veterinary health business of Henry Shein. VDS has always had its own corporate identity and was not merged into Covetrus.

Finally, the existence of the "Covetrus Connect" product in no way supports Actian's claim that Covetrus and VDS are alter egos. Covetrus Connect, known as VetData Marketplace prior to Covetrus's rebranding, is a service that connects third party technology providers to vet clinics. (SOF ¶ 8). Covetrus Connect uses certain data from customer PIMS, but Covetrus Connect did not make use of the Software in any way, and the Software is not embedded in or distributed through Covetrus Connect. (SOF ¶ 9). The fact that Covetrus Connect makes incidental use of PIMS's data, regardless of whether VDS converted the data with the Software, or did so with its own software

rather than Actian's, does not suggest that the parties disregarded the corporate form such that equity requires Covetrus's involvement in this case.

### 3. *Covetrus is entitled to Summary Judgment on Secondary (Indirect) Infringement: Contributory and Vicarious Infringement*

The Supreme Court has established rules governing contributory and vicarious liability for copyright infringement: contributory infringement is "intentionally inducing or encouraging direct infringement," and vicarious infringement is "profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930-31 (2005).

Actian has no evidence that would allow any reasonable fact finder to determine that Covetrus had any intent to induce or encourage VDS to infringe Actian's copyrights. The first of the copyrights in suit to be registered was in October 2020, only four months before Actian's allegations of excessive deployment and unauthorized use in January 2021. Covetrus was formed in 2019, and in both fiscal year 2019 and 2020 had sales revenues of about $4 billion. The VDS revenue on conversions would have been a tiny fraction of revenue (roughly 0.000125 percent). The short timeframe of Covetrus' involvement, the short period between registration and demand, and the relatively small percentage of income Covetrus would have gained from any infringement belie any intent on the part of Covetrus to induce or encourage VDS. In the absence of intent to cause VDS to infringe, Covetrus is not liable for contributory infringement. *MGM*, 545 U.S. at 930-31.

Further, there is no evidence that Covetrus acted with intent to foster infringement or approval of the infringement, and Actian has no evidence that Covetrus declined to stop VDS's alleged infringement. Covetrus and VDS wanted to negotiate a solution, but negotiations broke down over Actian's demand for a tremendous amount of money, approximately $4.5 million to

$13.5 million, for a "true-up" on a perpetual license that cost $5,000. Actian made the deliberate decision not to ask VDS to cease and desist because it wanted VDS to continue to use the software. (SOF ¶ 69). After negotiations failed, Covetrus and VDS filed a lawsuit to protect their rights since there was no time VDS received a download of a Version "9.x," and the 9.x copyright registration was riddled with errors. Finally, VDS found and installed replacement software within about 8 months. (SOF ¶ 74). Accordingly, Covetrus is not liable for vicarious infringement. The Court should enter summary judgment for Covetrus.

### D. Plaintiffs Move to Resolve the Key Legal Issues of Contract Interpretation.

As demonstrated above, Actian's breach of contract claim fails because it is barred by the applicable statute of limitations. If the contract claim is to go to trial, however, key issues must be decided by the Court. Since contract interpretation is a question of law, with limited exceptions, summary judgment is appropriate to determine that (1) the Version 9 EULA is the entirety of the parties' agreement, (2) the exclusive **breach of contract** remedy is provided by paragraph 14 of the EULA, termination and forfeiture of royalties paid, which exposes unlicensed use after termination to copyright infringement claims; (3) the terms in the Support Policy are not legally incorporated into the parties' agreement, (4) the Version 9 EULA did not require purchase of maintenance and support services, (5) the Version 9 EULA does not define, let alone prohibit, "commercial use," and (6) if any damages are permitted for breach of the contract beyond paragraph 14, the use is measured by "CPUs" not "cores." Judicial interpretation of these essential contract terms will narrow the issues to be tried going forward.

Actian's counterclaim for breach of contract is premised solely upon the alleged breach of the Version 9 EULA. *See* Doc. 235, Actian's Suppl. Counterclaims ¶ 43 ("A contract exists between Actian and Counter-Defendants, as embodied in the Agreement attached hereto as Exhibit A." [Exhibit A, Doc. 235-1, the Version 9 EULA]). Actian alleges that Plaintiffs breached the Version

20

9 EULA by over-deploying the Software and by using the Software to perform services for VDS's customers. The parties agree that Texas law governs the Version 9 EULA. (SOF ¶ 30).

Under Texas law, the interpretation of an unambiguous contract is a question of law. *Kern v. Sitel Corp.*, 517 F.3d 306, 309 (5th Cir. 2008). The court determines what is required of each party under the contract, and, "insofar as a dispute exists concerning the failure of a party to perform," the court submits disputed fact questions to the jury. *Lookshin v Union Planters Bank*, 2006 WL 3147330, at *7 (S.D. Tex. Oct. 30, 2006).

### 1. *The Version 9 EULA is the Entire Agreement Between Actian and VDS.*

Based on the undisputed facts and as a matter of law, the Court should find that the entire agreement between Actian and VDS is encapsulated by the language of the Version 9 EULA.

Section 15.1 of the Version 9 EULA states, "This Agreement represents the complete agreement concerning the subject matter between you and Pervasive and supersedes all prior agreements and representations between you and Pervasive." (SOF ¶ 28). "By entering into an unambiguous agreement with a merger clause, the signing appellants have foreclosed their reliance on prior agreements and their use of parol evidence to contradict the agreement's objective language." *Biko v. Siemens Corp.*, 246 S.W.3d 148, 161-62 (Tex. App.—Dallas 2007, pet. denied) (citing *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 666 (Tex. App—Dallas 2004, pet. denied)*, followed by Bryan v. Hum. Power of N Co.*, No. 03-22-00632-CV, 2024 WL 734654, at *10–11 (Tex. App.—Austin Feb. 23, 2024, review denied).

Section 15.2 of the EULA states that it "may be amended only in writing executed by both parties," and specifies that the EULA prevails even over later purchase orders: "***Any purchase order placed by you is accepted only upon your assent to the terms and conditions of this Agreement, and not those contained in Your purchase order.***" (SOF ¶ 29) (emphasis added). Despite this explicit language, Actian asserts that the language on its website, referenced only via

a link in the 2020 Sales Order for maintenance and support, without any context or other explanation, added to and superseded the language in the Version 9 EULA. (SOF ¶ 55). Since VDS had a perpetual, paid up license, it could not be required to buy maintenance or support. Similarly to Section 15.1, Section 15.2 is unambiguous, and must be enforced as written. 2024 WL 734654, at *10–11.

In addition to the plain language of Section 15.2 and 15.3, the plain language of the 2020 Sales Order states that the terms of the applicable EULA apply. Further, Actian's Support Policy, referenced solely by link in paragraph 4 of the 2020 Sales Order, is not legally incorporated into the agreement (Version 9 EULA) between VDS and Actian.

Through Sales Order No. 744697 (the "2020 Sales Order"), VDS paid $5,199.30 to secure annual maintenance and support services for the Software. (SOF ¶ 53). Chauncey Fannin, VDS's Senior Operations Manager, signed the purchase order on January 29, 2020:



(SOF ¶ 54). The 2020 Sales Order lists four "Terms and Conditions." The first states "Acceptance of this order is subject to the terms of the applicable signed agreement with Actian corporation

(formerly Ingres or any of its subsidiaries, including Paraccel, Pervasive, and Versant), or (if none) the licensee agreement associated with the above referenced product." *Id.* Because VDS had the separate EULA agreement with Actian, the 2020 Sales Order is subject to a "license agreement associated with the above referenced product" *i.e.,* the Version 9 EULA. (SOF ¶ 54). This undisputed fact is yet another independent reason that the Court should find that the agreement between VDS and Actian is limited to the Version 9 EULA. Since Pervasive/Actian is the drafter of this form agreement, it is construed in favor of VDS. *See, Barnes v. Forest Hills Inv., Inc.*, 11 F.Supp.2d 699, 706 (E.D. Tex. 1998).

The second term in the 2020 Sales Order covers fees and taxes, the third rejects any customer terms, and the fourth simply states: "Actian Corporation Support Policy" and provides a link to Actian's Support Policy. (SOF ¶ 54). Through this fourth condition, Actian alleges that the terms in the Support Policy were incorporated into the Version 9 EULA and became legally binding on VDS. (SOF ¶ 55). However, Texas courts have made clear that the mere reference to a link in the terms and conditions is not sufficient to make them a binding part of the parties' agreement. When considering whether a second document is incorporated by reference into an agreement, the Texas Court of Appeals has explained that "the language used to refer to the incorporated document is not important as long as the signed document 'plainly refers' to the incorporated document." *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013). "Plainly referring to a document requires more than merely mentioning the document. The language in the signed document must show the parties intended for the other document to become part of the agreement." *Id.* (internal citations omitted); *see also* 17A C.J.S. Contracts § 402 (2011) ("For an incorporation by reference to be effective, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms"); *In re Freightquote.com*, No. 05-18-

23

01028-CV, 2019 WL 995791, at *4 (Tex. App.—Dallas Mar. 1, 2019) (holding terms and conditions not incorporated by reference because the document did "not otherwise suggest that the parties intended for the internet document to become part of their agreement. Instead, this language indicates that the internet document contained informative material only, not binding terms and conditions intended to be part of the parties' contract"). Here, the phrase "Actian Corporation Support Policy: [link]" does not make it clear in any way that it is more than additional information for a customer's reference, and VDS was never informed of any binding support policy. (SOF ¶¶ 56-57). Because mere inclusion of a link is not enough to add binding contract terms, the Court should find as a matter of law that the Support Policy was not incorporated by reference into any agreement between VDS and Actian. Further, there is no indication that the Support Policy change applied retroactively to all prior years of the EULA, as opposed to the first year covered in the 2020 Sales Order.

Further, Actian cannot maintain its claim to incorporate the Support Policy under the principle of novation because there was no mutual agreement to any new terms contained in a Support Policy. The earliest Support Policy that Actian produced was from 2015, after VDS purchased licenses to Version 8.12 or 9.2 of the Software. (SOF ¶¶ 58-59).

VDS also had no notice of Actian's unilateral changes of the Support Policy over time. Marc Potter, Actian's prior Chief Revenue Officer and current Chief Executive Officer, testified that Actian does not, and need not, notify its customers when it changes the terms contained in its Support Policy. (SOF ¶ 60). Mr. Potter testified that a customer following the standard EULA, such as VDS, would only be notified of Actian's Support Policy via referencing the link on sales orders. (SOF ¶ 61). Through its Support Policy only, Actian implemented the three times

obsolescence fee it now demands VDS pay. Pervasive (the Version 9 EULA licensor) did not have a three times obsolescence fee provision, nor is it contained in any EULA. (SOF ¶ 62).[5]

Thus, even if this Court finds that certain claims should survive summary judgment, the Court should hold that the Version 9 EULA is the entire Agreement between Actian and VDS because (1) it contains a valid integration clause; (2) it can only be amended in writing; (3) the Support Policy was not incorporated by reference, and (4) there was no meeting of the minds as to any new terms that Actian attempted to add through the 2020 Sales Order. *See e.g.,* Doc. 242 at 7-9 (Plaintiffs' Affirmative Defense Nos. 1-2, 11-14).

### i.   *Under the Version 9 EULA Termination Upon Breach Is Exclusive Remedy*

Relatedly, but separate, Section 14 of the Version 9 EULA states that "[t]his Agreement will automatically terminate if you breach any of the terms and conditions of this Agreement." (SOF ¶ 27). By Actian's allegation, VDS breached the Agreement by over-deploying the Software on multiple machines and using it to convert third-party customer data. As shown, it is undisputed that VDS only ever used the Software to convert third-party customer data and deployed the Software on multiple machines to do so. (*See e.g.*, SOF ¶ 15, 17, 82). Thus, the alleged breach occurred when VDS started using the Software in 2006, and certainly no later than 2011 when it paid for Version 9.2. (SOF ¶ 11, 13). Section 14 is unambiguous and must be enforced as written.[6] *Bryan*, 2024 WL 734654, at *10–11. Actian's remedy here is damages or an injunction for

---

[5] While the Version 9 EULA never references Actian's Support Policy (and could not, as the Support Policy did not exist at the time), the EULAs for later versions of the Software – to which VDS is not subject – explicitly reference Actian's Support Policy by their terms. (SOF ¶ 35) (Version 10 and Version 11 EULAs state: "The details of the Support Services can be found at http://supportservices.actian.com/support-services/support#policy."). Unlike the Version 9 EULA, which was implemented and drafted by Pervasive prior to Actian's involvement, Actian, itself, implemented the Version 10 and Version 11 EULAs. (SOF ¶¶ 31-32). Try as it might, Actian cannot read the terms of later EULAs into the terms of the Version 9 EULA.

[6] While the Version 9 EULA terminates "automatically" upon breach, the EULAs for later versions of the Software – to which VDS is not subject – require "written notice of breach." (SOF ¶ 37) (Version 10 and Version 11 EULAs state: "either party may terminate this Agreement or an Order (i) by written notice of breach of the Agreement or such Order, provided the other party fails to cure such breach within thirty days after such notice"). Actian cannot read the terms of later EULAs into the terms of the Version 9 EULA.

copyright infringement because the exclusive contract remedy is termination of the license (leaving the user subject to infringement claims). *See, e.g., Aquarian Found., Inc. v. Lowndes,* 127 F.4th 814, 822 (9th Cir. 2025), citing, *Jarvis v. K2 Inc.*, 486 F.3d 526 (9th Cir. 2007) (affirming damages award for infringement because defendant continued to use copyrighted materials after termination of the license agreement).

### 2. *The Version 9 EULA Did Not Require Maintenance and Support Services.*

On its face, and as acknowledged by Actian's CEO, the Version 9 EULA does not require Maintenance and Support Services. (SOF ¶ 24). While every year VDS did purchase some services, it sometimes purchased one or the other. (SOF ¶¶ 38, 42-43). Because Actian impermissibly assumes in its damages model that Maintenance and Support Services were required, if any part of Mr. Held's opinions remain, or the breach of contract claim survives, the Court should find that as a matter of law, the Version 9 EULA did not require a licensee to purchase Maintenance and Support Services. *See e.g.,* Doc. 242 at 7 (Plaintiffs' Affirmative Defense No. 1).

### 3. *The Version 9 EULA Does Not Define "Commercial" Use.*

Regarding third-party use, Section 6 of the Version 9 EULA states, "You may not directly or indirectly sublicense, lease or rent the Software for third party use without prior written approval of Pervasive. You may not use, access, or allow access to the Software in any manner to provide service bureau, ASP, time-sharing, or other computer services to third parties without prior written approval of Pervasive." (SOF ¶ 26). Actian alleges that VDS breached this provision by providing its third-party conversion services without a commercial (also referred to as partner) license.

The record is clear that "commercial" use is not defined anywhere in the Version 9 EULA, and the need for a different license was never raised with VDS, despite Actian's awareness of how VDS was using the Software from the initial training that VDS purchased in 2006 for $11,000 (which was more than the license itself). (SOF ¶¶ 80-92; Doc. 349-2). The evidence suggests that,

26

at the time VDS entered into the Version 9 EULA, conducting conversions for third-party customers was a common use case for the Software (SOF ¶ 93-94), and Pervasive did not require VDS to purchase anything other than the Version 9 software to perform its service. (SOF ¶¶ 78-79).

#### 4.  *The Version 9 EULA does not measured use by "cores."*

Finally, as also discussed in Plaintiffs' Motion to Exclude the testimony of Actian's damages expert Mr. Held, Actian's damages model measures deployment of the Software by cores despite 'use' being discussed in terms of CPUs in the Version 9 EULA. (SOF ¶ 25).[7] If any part of Held's opinions remain, or the breach of contract claim survives, the Court should find that as a matter of law, the Version 9 EULA measured software deployments by CPUs, not cores. The Version 9 EULA explicitly referred to CPUs and did not mention cores.[8] Actian has no evidence that CPU and core should not be given their ordinary meanings in the contract.  If the Court finds that any part of Actian's breach of contract claim survives, this Court should find that the Version 9 EULA does not define "commercial" use.

#### E.  **Actian's Copyright Infringement Claims Fail as a Matter of Law—The Registrations Are Not Prima Facie Evidence of Validity.**

Registration of a work is not a precondition of copyright protection, but "the Copyright Act makes registration a precondition to filing a valid copyright infringement claim." *Airframe Sys., Inc. v. L-3 Commc'ns Corp.*, 658 F.3d 100, 105 (1st Cir. 2011) (citing 17 U.S.C. § 408(a) and *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)); *see* also *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 309 (2019) (registration occurs under 17 U.S.C. § 411(a) "when the Register has registered a copyright after examining a properly filed application."). Thus, proof

---

[7] While the Version 9 EULA only refers to "CPUs," the EULAs for later versions of the Software – to which VDS is not subject – explicitly refer to both CPUs and cores. (SOF ¶ 34 (The Version 10 and Version 11 EULAs discuss Software deployment and usage in terms of CPUs and cores)). Again, Actian cannot read the terms of later EULAs into the terms of the Version 9 EULA.

[8] Cores are processing circuitry that perform general operations placed on the chip, the "silicon," which is the CPU. Multiple cores can operate on a single CPU and could at the time of the 2008 Version 9 EULA.

of registration of the allegedly infringing work is an element of a claim for copyright infringement. *Id.* In addition to proving that the allegedly infringed work is subject to a registered copyright, Actian also bears the burden to prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Airframe Sys.*, 658 F.3d 100 at 105 (citing *Situation Mgmt. Sys., Inc. v. ASP Consulting LLC*, 560 F.3d 53, 58 (1st Cir. 2009); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 360 (1991)). Here, Actian cannot meet its burden because, despite years of discovery and significant expense, there is no evidence of copyright infringement.

Copyright protection exists for "**original** works of authorship." 17 U.S.C. § 102(a) (emphasis added). A certificate of registration obtained within five years of the first publication of the work "constitute[s] prima facie evidence of the validity of the copyright and of the facts stated in the certificate," including ownership and originality. 17 U.S.C. § 410(c); *see Latin Am. Music Co. Inc. v. Media Power Grp., Inc.*, 705 F.3d 34, 38 (1st Cir. 2013); *Johnson v. Gordon*, 409 F.3d 12, 17 (1st Cir. 2005). After five years, the evidentiary weight accorded to a certificate of registration is left to the court's discretion. 17 U.S.C. § 410(c). Even for copyrights timely registered, a certificate is only prima facie evidence of validity until credibly rebutted, as Plaintiffs have done throughout this litigation.

| CHART I: THE ASSERTED COPYRIGHTS | | | | |
|---|---|---|---|---|
| **Copyright No.** | **Version** | **Date of 1ˢᵗ Publ.** | **Registration** | **Dating Issue** |
| TX 9-058-230 | 8.12 Engine | Sept. 20, 2006 | January 3, 2022 | Registered 15 years and 3 months after publication |
| TX 9-058-232 | 8.12 UI | Sept. 20, 2006 | January 3, 2022 | Registered 15 years and 3 months after publication |
| TX 8-902-355 | 9.x Engine | No. 30, 2007 | October 8, 2020 | Registered 12 years and 10 months after publication |
| TX 8-902-344 | 9.x UI | Nov. 30, 2007 | October 8, 2020 | Registered 12 years and 10 months after publication |
| TX 9-260-777 | 9.2.6.6 Engine | January 9, 2013 | May 11, 2023 | Registered 10 years and 5 months after publication |

| TX 9-260-366 | 9.2.6.6 UI | January 9, 2013 | May 11, 2023 | Registered 10 years and 5 months after publication |
| TX 9-260-358 | 9.2.7.10 Engine | May 16, 2013 | May 11, 2023 | Registered 10 years after publication |
| TX 8-902-360 | 10.6 Engine | March 31, 2016 | October 8, 2020 | Registered within 5 years of publication |
| TX 8-902-319 | 10.6 UI | March 31, 2016 | Sept. 28, 2020 | Registered within 5 years of publication |
| TX 8-898-417 | 11.6 Engine | Sept. 28, 2020 | Sept. 28, 2020 | Registered within 5 years of publication |
| TX 8-899-134 | 11.6 UI | Sept. 28, 2020 | Sept. 28, 2020 | Registered within 5 years of publication |

(*See also* SOF ¶¶ 96-97).

As Chart I shows, the certificates of registration for the Version 8 and 9 Asserted Copyrights (TX 9-058-230, TX 9-058-232, TX 8-902-355, TX 8-902-344, TX 9-260-777, TX 9-260-366, TX 9-260-358) were obtained 10-15 years after their first publications. Accordingly, the certificates are not *prima facie* evidence of validity, and Actian has not presented any other evidence as to the validity of the seven long-delayed copyrights. (SOF ¶ 98). The registrations get no weight to help Actian meet its burden of proof on validity.

Actian's copyright registrations cannot be given any weight considering the delay and loss of evidence. For the first two years of the lawsuit, there was only one registration in issue, 9.x. After 14 months of discovery, Actian determined that there was no version of the Software that was 9.x and filed a supplemental registration for 9.3.0.9.

Moreover, the evidence from Pervasive prior to the Actian takeover is spotty; the original Version 9 EULA supposedly executed by VDS in 2008 or 2009 has never been found. Actian says it lost release 9.2.5.28, a version of the Software that is highly material to this case. *See* Motion to Exclude HelfinSiegel (filed contemporaneously herewith). Indeed, the first two years of this lawsuit were spent solely on the one registration in suit, Version 9.x, which Actian effectively conceded was riddled with problems by filing a supplemental registration. Actian did not disclose

the Supplemental Registration when filed nor when the first one issued during the discovery period.  Rather Actian waited to inform Covetrus and VDS of the Supplemental Registration evidence after expert reports, after all fact and expert depositions, and after the end of the business day on the original last day of discovery back in 2022. Of the three registrations that came after the fact, there are serious problems, as shown in the Motion to Exclude HelfinSiegel's expert testimony.

Even if the certificates were *prima facie* evidence of validity, that alone is insufficient in this case to prove validity given the material holes in the history of the Software from Pervasive to Actian. Essentially, Actian bought Pervasive in February 2013, more than seven years after the date of first publication of Version 8.12 UI and 8.12 Engine, more than six years after Version 9 was first released, a month after the date of first publication of Version 9.2.6.6 UI and 9.2.6.6 Engine, and only three months before the date of first publication of Version 9.2.7.10 Engine. Then, in 2022-2023, long after the Pervasive's acquisition, Actian decided to seek copyright registrations for the works to benefit its litigation strategies as it became "more serious about enforcing licensing." (SOF ¶¶ 88, 96). All this after Actian put the Software "on the back burner", focused on their tools for years, while the relevant history and record eroded. (SOF ¶ 94).

Despite it carrying the burden of proof to prove its copyrights are valid, Actian did not produce its source code repository – relying instead on cherrypicked productions that do not present a whole picture. (SOF ¶¶ 99-100). Actian did this even though its technical expert, Joshua HelfinSiegel, specifically testified that it is important for an expert to review the source code repository when evaluating copyrights "because it keeps a historical record that will allow you to roll back the clock on the source code so that you can extract it as of a date that it existed in the past." (SOF ¶ 100). A historical record of the source code is even more important in cases such as

this, where the claimed author of many portions of the Software (Pervasive) has long since ceased to exist and the successor claimant (Actian) sought registration over a decade after first publication of the respective works.

Actian's failure to produce the source code repository, despite (1) carrying the burden of proof, (2) its expert's opinion on how important reviewing the repository is, and (3) Plaintiffs' requests for production, highlights the deficiencies in Actian's case and the holes in the source code's timeline. Specifically, while Actian alleges infringement on versions that came before and after Version 9.2.5.28 was released, Actian was unable to locate the code for that version of the Software. (SOF ¶ 99). Version 9.2.5.28 was released in November 2010, three years prior to Actian's acquisition, and ten to thirteen years prior Actian's registration of Versions 9.2.6.6, 9.2.7.10, 10.6, and 11.6. (*See* Chart I; *see also* Release Schedule, Doc. 349-22). Mr. HelfinSiegel testified that because Actian did not produce the source code repositories, he could not look back to explain what happened with Version 9.2.5.28. (SOF ¶ 99). Given this break in the chain, and the fact that each successive version of the Software is cumulative of the preceding code, losing an entire released version preceding later registered versions raises serious doubts into the validity of the Asserted Copyrights. (SOF ¶¶ 99, 104 (Actian "do[es not] remove code")). Without an intact chain of source code, there is no way to evaluate the originality of each release, and therefore the original content that could be copyrightability, in each subsequent version.

When registering multiple versions of the same computer program, each registered version must contain substantial amounts of original, protectable material. 17 U.S.C. § 103; *see, e.g., Montgomery v. Noga*, 168 F.3d 1282, 1289-90 (11th Cir. 1999). "Put another way, elements distinct to an unregistered work cannot draw protection from a registered work even though the latter may contain the seminal idea that inspired both works." *Johnson v. Gordon*, 409 F.3d 12, 20

(1st Cir. 2005) (citing 2 Nimmer on Copyright § 7.16[B][2][b]). A subsequent software version is not within the scope of copyright covering a prior version where the second program contained "qualitative" differences developed through significant effort of the programmer. *In re C Tek Software, Inc.*, 127 B.R. 501, 506-07 (D. N.H. 1991) (citing *Dynamic Sols. Inc. v. Planning & Control, Inc.*, 646 F.Supp. 1329, 1339 (S.D.N.Y. 1986)). Copyright scope is especially important in software because code provides "process, system, [and] method of operation", are not copyrightable by statute. 17 U.S. Code § 102(b); *see Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 815 (1st Cir. 1995), *affirmed*, 526 U.S. 233 (1996). A registration for a specific version of a computer program does not cover previously published or previously registered source code, only what was original in that version. U.S. Copyright Office, Circular 61. Actian's copyrights lack originality between the registered versions, as well as the unregistered versions. Actian bears the burden to prove otherwise, but it failed to produce evidence that could (even theoretically) support a finding that each successive version contains sufficient copyrightable originality over prior versions.

Actian's corporate witness, Ms. Kathryn Van Dyken, testified that each successive version of the Software is cumulative of the preceding. (SOF ¶ 104). Ms. Van Dyken further testified that she pulled the source code for each copyright deposit by sorting the files alphabetically from A-Z and printing the first 25 pages from the A file and the last 25 pages from the Z file. (SOF ¶ 106; *See also* SOF ¶¶ 102-103, 107). Given the cumulative nature of the Software, it is implausible that such rudimentary procedures would create deposits representative of the actual version being registered, and Actian has failed to prove otherwise despite it having that burden and complete control over every version of the code and the repositories. To the contrary, Actian's technical witness, Mr. HelfinSiegel opined that there is significant overlap (*i.e*., non-originality) in code

32

between the version VDS actually had (Version 9.2.7.10) and the other registered versions. (SOF ¶ 101). For example, HelfinSiegel opined that there is only 0.3% difference (across two to four code files) between the Version 9.2.7.12 Engine[9] and the Version 9.2.6.6 Engine (*i.e.*, there is 99.7% identical code between registered versions – a clear lack of originality). HelfinSiegel II at ¶¶ 19-20 (reports attached to co-pending motion to exclude). Worse still, HelfinSiegel explained that the 0.3% difference included "bug fixes and removing code for special handling of an additional database type, for example." *Id.* Such minimal changes cannot contain substantial amounts of original, protectable material such that each version is separately protectable. 17 U.S.C. § 103; *see, e.g., Montgomery*, 168 F.3d at 1289-90. Moreover, the types of code mentioned by Actian's expert are not copyrightable under 17 U.S.C. § 102(b).

Plaintiffs request that the Court decide and disclose the evidentiary weight it will accord the Version 8 and 9 copyright registrations (all registered 10-15 years after first publication and not prima facie evidence) per 17 U.S.C. § 410(c). If the Court affords them little to no weight, as is appropriate, summary judgment is warranted for at least the Version 8 and 9 copyrights on validity as Actian has no other evidence.

### F. Actian is Not Entitled to Statutory Damages or Attorneys' Fees.

Actian is not entitled to statutory damages or attorneys' fees under the Copyright Act because the alleged infringement began prior to the effective dates of the copyright registrations, which were not made within three months after the first publication of the work. *See* 17 U.S.C. § 412. As detailed above, since 2006 VDS has used the Software, deployed on multiple VDS machines, for its conversion services business servicing third-party customers. (SOF ¶ 15). Deploying the Software on multiple machines to support services for third-party customers is the

---

[9] Actian was unable to locate code specific to the allegedly infringed Version 9.2.7.10 used by VDS but stated that Version 9.2.7.10 is the released version of Pervasive's internal Version 9.2.7.12.

entire basis of Actian's copyright infringement claims, which it calls unlicensed use. (Doc. 235 at ¶ 51). As Chart I above shows, none of the Asserted Copyrights existed until 2020, and all (but Version 11) of the Asserted Copyrights were filed more than three months after the first publication of the respective work. (*See also* SOF ¶¶ 96-97). Specifically, the effective dates of the Version 8 copyrights are more than 15 years after first publication; the effective dates of the Version 9 copyrights range from 10 years to nearly 12 years after first publication; and the effective dates of the Version 10 copyrights are more than 4 years after first publication.

As for the Version 11 copyrights, which were reportedly filed on the same day as first publication of the respective works on September 28, 2020, statutory damages and attorneys' fees remain inapplicable per 17 U.S.C. § 412 because the alleged infringement commenced before the effective date of the registration. The alleged infringement commenced in 2006, and certainly no later than 2013 when VDS upgraded to Version 9.2.7.10 of the Software (the version upon which all of Actian's claims are based). (*See* SOF ¶¶ 13-14). The effective date of registration for the Version 11 copyrights is seven (if 2013) to fifteen years (if 2006) post the start date of the alleged infringement. The same is true for all other copyrights, only to longer degrees. This is not to mention the fact that Actian's copyright claims are implausible and unproven, as explained above. A party cannot be entitled to statutory damages or attorneys' fees based on such facts.

Accordingly, as a matter of law, Actian is not entitled to recover statutory damages or attorneys' fees, even if it could establish liability. 17 U.S.C. § 412.

## V.   CONCLUSION

For the foregoing reasons, among others, the Court should grant declaratory judgment in the Plaintiffs' favor as Actian's counterclaims are time barred, contrary to the plain language of the asserted agreement, and contrary to copyright law. Moreover, Actian's claims against

Covetrus, despite years of discovery, are unproven, false, and should be dismissed in their entirety.

And Actian is not entitled to statutory damages or attorneys' fees under the Copyright Act.

Date: June 10, 2025                    Respectfully submitted,

*/s/ Danielle J. Healey*
Danielle J. Healey, admitted *pro hac vice*
Brian G. Strand, admitted *pro hac vice*
SPENCER FANE LLP
3040 Post Oak Blvd., Suite 1400
Houston, TX 77056-6560
Telephone: (713) 552-1234
dhealey@spencerfane.com
bstrand@spencerfane.com

Brian Medich, admitted *pro hac vice*
SPENCER FANE LLP
900 16th Street NW, Suite 400
Washington, DC 20006
Telephone: (713) 212-2676
bmedich@spencerfane.com

Stephen J. Zralek, admitted *pro hac vice*
SPENCER FANE LLP
511 Union Street, Suite 1600
Nashville, TN 37219
Telephone: (615) 238-6305
szralek@spencerfane.com

Paul McDonald
BERNSTEIN SHUR
100 Middle Street, P.O. Box 9729
Portland, Maine 04104-5029
Telephone: (207) 774-1200
pmcdonald@bernsteinshur.com

*Attorney for Plaintiffs Covetrus, Inc. and*
*Veterinary Data Services, Inc.*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on June 10, 2025, a true and correct copy of the foregoing document was electronically filed via the Court's CM/ECF system, which will send a notification of filing to all counsel of record.

*/s/ Danielle J. Healey*
Danielle J. Healey