UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| COVETRUS, INC. and VETERINARY DATA SERVICES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ACTIAN CORP., <br><br> Defendant. | ) ) ) ) ) ) ) ) 2:21-cv-00097-SDN ) ) ) ) ) ) ) |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the Parties' cross motions for summary judgment. Plaintiffs Covetrus, Inc. and Veterinary Data Services ("VDS") brought this action against Actian Corp., seeking a declaratory judgment that VDS did not infringe Actian's copyrights of the Data Integrator Software ("the Software") licensed by VDS.[1] *See* ECF No. 38 (First Amended Complaint). Actian counterclaimed, alleging breach of contract and copyright infringement. *See* ECF No. 235 (First Supplemental Counterclaims). Both Parties now move for summary judgment on these claims. *See* ECF Nos. 364, 356. For the reasons that follow, the Court **DENIES** these motions.

---

[1] Although Covetrus is a plaintiff in the action, this Order refers to the relevant party as VDS unless Covetrus is specifically identified.

1

## I. Background

### A. Undisputed Facts

VDS is a Kentucky-based company and a subsidiary of Covetrus, a Maine corporation formed in 2019. ECF No. 38 at 2.[2] In 2006, VDS licensed a non-commercial version of the "Data Integrator" Software from Actian to map and migrate historical veterinary data into Practice Information Management Services ("PIMS") for third-party veterinary clinics. ECF No. 38 at 1, 5. VDS originally purchased a perpetual license for Version 8 in 2006, eventually upgrading to Version 9.2.7.10 in 2011—the version at issue in this case ("Version 9"). *Id.* at 5. Actian's Version 9 End User License Agreement ("EULA") governs this software. *See* ECF No. 356 at 2; ECF No. 235-1 ("EULA"). Covetrus was not a signatory to the EULA.

In 2017, Actian issued an audit request to VDS that indicated VDS had installed five copies of Version 9 on five different production engines, i.e., computers. ECF No. 365 at 9. Actian made no allegations of breach of contract or copyright infringement at that time. *Id.*

In December 2019, VDS purchased another year of service and maintenance support for Version 9 of the Software, as well as post-obsolescence support, for a total of $5,199, to go into effect in 2020. ECF No. 235-2 at 1 ("2020 Sales Order"). Attached to the 2020 Sales Order was a set of terms and conditions, which stated, in reference to Version 9, "Acceptance of this order is subject to the terms of the applicable signed agreement with Actian Corporation . . . , or (if none), the license agreement associated with the above referenced product." *Id.* at 2. The terms and conditions also provided a

---

[2] All pincites are based on the ECF-generated page numbers for the filing, which in some instances differ from the page numbers inserted by the Parties.

URL along with text that read "Actian corporation support policy." *Id.*; *see* ECF No. 235-3 (Support Policy). The Support Policy states all perpetual licenses—of the sort VDS had purchased—require active and ongoing support contracts. *See* ECF No. 235-3 at 3.

Following the 2020 Sales Order, a 2021 Audit revealed VDS had installed Version 9 on twenty-one computers with twelve total users, and that VDS had purchased three licenses for the Software. ECF No. 364 at 11. Following that audit, Actian alleged VDS should have purchased commercial, rather than non-commercial, licenses and demanded VDS pay $13.5 million based on the number of commercial licenses it calculated VDS should have purchased based on the 2021 Audit. *Id.* VDS rejected the demand and filed this action for declaratory judgment with the Court on April 6, 2021. *Id.*; ECF No. 1.

### B.  Procedural History

The procedural history involves multiple copyright registrations and discovery disputes and is summarized here only as relevant to the pending motions.

In 2021, VDS sought declaratory judgment that they had not infringed Actian's copyright. ECF No. 38 at 8–10. VDS also advanced several alternative arguments including: (1) any infringement, if found, was not willful, (2) the copyright claims are time-barred, (3) Actian's copyrights are unenforceable due to misuse, and (4) Actian is estopped from enforcement based on its prior knowledge of VDS's use. *Id.* at 11. Actian filed its first counterclaims in May 2021, alleging breach of contract and copyright infringement. ECF No. 14 at 10–13.

In 2020, Actian applied to register two copyrights for Version 9 of the Software, which the United States Copyright Office granted. ECF No. 114 at 2. On April 11, 2022, Plaintiffs moved to refer questions regarding the validity of those copyrights to the Register of Copyrights, alleging Actian's copyright registrations were invalid and

3

predicated on inaccurate information. *Id.* at 3. This Court denied the motion. ECF No. 184.

In May 2023, Actian applied for, and the Copyright Office granted, additional certificates of registration, including registration of the Version 9 engine—the version of the Software VDS had licensed. ECF No. 231 at 7. Actian then sought leave to supplement its counterclaims to assert a claim of copyright infringement of the latest registrations, including Version 9. *Id.* This Court granted the motion to amend, *id.* at 15, and Actian filed its supplemental counterclaims to incorporate infringement of the Version 9 copyright, ECF No. 235.

For the next several years, the Parties engaged in protracted discovery disputes. The Parties subsequently filed cross motions for summary judgment on the copyright infringement and breach of contract claims, which can be categorized into several primary disputes: (1) whether VDS's customary usage of the Software to provide data migration services to third parties is considered a breach of the EULA; (2) when and to what extent Actian was aware of the alleged breach; (3) whether VDS over-deployed the Software by installing it on additional machines or providing access to too many users; (4) whether Covetrus is a corporate alter ego of VDS; and (5) whether Version 9's copyright registration is valid as an original work. *See generally* ECF Nos. 356, 364. VDS also moved to exclude the report and testimony of Actian's expert, Mr. Robert Held, who opined on the extent of Actian's damages, ECF No. 354, and to exclude the report and testimony of Actian's technical expert, Mr. Joshua HelfinSiegel, who provided opinions on the alleged copyright infringement, ECF No. 355. In turn, Actian moved to exclude the testimony of VDS's technical experts, Mr. Peter Martin and Mr. William Nash, who testified to the Software's source code. ECF No. 371. These motions are now ripe for decision.

4

## II. Legal Questions

The Parties raise several legal issues that can be resolved on the existing record as a matter of law. Before turning to the Parties' cross-motions for summary judgment, the Court addresses these threshold questions governing choice of law and the availability of certain defenses.

### A. Choice of Law

A federal court sitting in diversity applies the forum state's choice-of-law rules to determine which substantive law applies. *See Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am., LLC*, 794 F.3d 200, 204 (1st Cir. 2015). "The state of Maine follows the Restatement (Second) of Conflicts of Laws and the 'most significant contacts and relationships' approach in determining choice of law." *Walker v. Unum Life Ins. Co. of Am.*, 530 F. Supp. 2d 351, 353 (D. Me. 2008) (quoting *Flaherty v. Allstate Ins. Co.*, 822 A.2d 1159, 1165 (Me. 2003)). However, the Court conducts a choice-of-law analysis regarding contract-based claims "only where the parties have failed to state which law controls." *Id*. Here, the EULA contains a choice-of-law provision which states: "This Agreement is governed by the laws of the State of Texas (U.S.A.) exclusive of its choice of law provisions." ECF No. 91-1 at § 15.3. Both Parties contend that Texas law therefore governs the Version 9 EULA. ECF No. 364 at 27; ECF No. 356 at 6. Generally, Maine will enforce a choice-of-law provision "unless either (a) the chosen state has no substantial relationship to the parties or the transaction . . . , or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state with a materially greater interest . . . ." *New Eng. Surfaces v. E.I. Du Pont De Nemours & Co.*, 460 F. Supp. 2d 153, 159 (D. Me. 2006), *aff'd*, 546 F.3d 1 (1st Cir. 2008), *decision clarified on denial of reh'g*, 546 F.3d 11 (1st Cir. 2008) (quoting Restatement (Second) of Conflicts § 187(2) (1971)).

5

Here, Texas has a "substantial relationship to the parties" because Actian's principal place of business is in Texas. *XL Sports World, LLC v. Dynamic Sports Constr., Inc.*, 784 F. Supp. 3d 289, 298 (D. Me. 2025); *see* ECF No. 91 at 1. Therefore, Texas law controls.

### B. Applicable Legal Standard Regarding Contract Claims

Under Texas law, contract construction is a matter of law. *See Plains Exploration & Prod. Co. v. Torch Energy Advisors, Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) (citing *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014)). A court's primary concern is to ascertain the Parties' intent by examining the entire writing to harmonize all provisions so none are rendered meaningless. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). "[T]erms are given 'their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning.'" *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 794–95 (Tex. 2012) (quoting *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009)).

When a contract's language is unambiguous, the Court must construe it as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Whether the contract is ambiguous is itself a question of law for the Court to decide. *See Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449 (Tex. 2011). "[A] trial court errs when it submits an unambiguous contract to the jury rather than construing it as a matter of law." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 480 (Tex. 2019). Thus, the Court must now determine whether any of the contract provisions at issue in this case are resolvable as a matter of law.

### C. Contract Interpretation Issues Resolvable as a Matter of Law

Based on the Parties' briefing and the undisputed portions of the record, the Court can resolve two contract interpretation issues at the summary judgment stage. These issues concern whether ancillary documents were incorporated into the agreement and the effect of the EULA's termination and survival provisions.

*1. Incorporation of Support Policy*

Actian contends the 2020 Sales Order—which provided a URL to the online Support Policy—incorporated that policy into the contract. VDS argues the Version 9 EULA alone remains the entire agreement.

The Terms & Conditions of the 2020 Support Policy state, "Acceptance of this order is subject to the terms of the applicable signed agreement with Actian Corporation . . . or (if none), the license agreement associated with the above referenced product." ECF No. 91-2 at 3. It then includes a clause reading "Actian Corporation Support Policy" and provides a link. *Id*. The online Support Policy requires the purchase of support services for all perpetual licenses. VDS stopped purchasing support for Version 9 in 2021. Actian CEO Marc Potter asserts the Policy requires a post-obsolescence fee for providing support for outdated versions, which he claims applies here. *See* ECF No. 350-10 at 31:13–32:18; ECF No. 91-4 at 9 ("Obsolescence Support provides . . . There is an additional charge (2x) for this level of support.").[3]

Texas law favors VDS's argument. "Merely referencing another document . . . does not incorporate the *entire* document when the language used in the incorporation clause

---

[3] According to Mr. Potter, the post-obsolescence fee amount is calculated by ascertaining the commercial license amount VDS ostensibly should have purchased (as compared to the non-commercial license they did purchase), multiplied by three. ECF No. 350-10 at 31:15–20. The Support Policy states the cost is two times the fee. ECF No. 91-4 at 9. Whether the cost is two or three times is immaterial to the analysis here.

does not indicate the parties' intent to do so." *Bancroft Life & Cas. ICC, Ltd. v. FFD Res. II, LLC*, 884 F. Supp. 2d 535, 552 (S.D. Tex. 2012) (quoting *Valero Mktg. & Supply Co. v. Baldwin Contracting Co.*, No. H–09–2957, 2010 WL 1068105, at *4 (S.D. Tex. Mar. 19, 2010)). The language in the signed document must show the parties intended for the external document to become part of the agreement. *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App. 2013). In *Dent Zone*, the appellate court rejected the incorporation of hyperlinked terms, noting the language indicated the document was informative rather than binding. *Id.* at 190.

Here, the Sales Order language does not indicate an intent to be bound by the Support Policy. Furthermore, Section 15.2 of the EULA states the EULA is the sole contract irrespective of any purchase order,[4] as does the Sales Order itself, which states it is governed by the "license agreement associated with the above referenced product," i.e., the Version 9 EULA. ECF No. 91-2 at 3. Thus, VDS's decision not to purchase a support policy after 2021 is not an actionable breach of contract.[5]

### 2. Effect of the EULA's Termination and Survival Provisions

VDS alleges Section 14 of the Version 9 EULA serves as the sole remedy for breach and that the contract terminated upon their first alleged breach in 2011, placing any current action beyond the limitations period. ECF No. 364 at 31–32. Actian argues Section 14 includes a survivability clause, which allows other sections of the EULA to survive any earlier breach. ECF No. 375 at 28–29.

---

[4] Section 15.2 of the EULA states, "This Agreement may be amended only in writing executed by both parties. Any purchase order placed by you is accepted only upon your assent to the terms and conditions of this Agreement, and not those contained in Your purchase order." ECF No. 91-1 at § 15.2.

[5] VDS also argues the Support Policy change did not apply retroactively. ECF No. 364 at 30. Because the Court finds the Policy was not incorporated into the contractual agreement, it does not address this argument.

Section 14 states, "This Agreement will automatically terminate if you breach any of the terms and conditions of this Agreement." ECF No. 91-1 at § 14. However, it goes on to say, "Sections 3, 4, 6, 7, 9, 11, 12, 13, 14 and 15 of this Agreement will survive any termination hereof." *Id*. Under Texas law, contractual sections that are specifically enumerated in a survival clause persist after termination, while sections that contain no language providing for survival terminate with the agreement. *See York Grp., Inc. v. Horizon Casket Grp., Inc.*, No. CIV A H-05-2181, 2007 WL 2120424, at *4 (S.D. Tex. July 11, 2007) (applying Texas state law). Section 4 (copyright restrictions) and Section 6 (third-party use) are specifically enumerated by the survivability clause. Therefore, the Court finds VDS's contention that the entire contract terminated in 2011, upon the first alleged breach, is incorrect: any enumerated surviving sections, such as Section 4 and Section 6, continue to apply. Thus, Actian can seek damages under Sections 4, 6, and 14.

### III. Motions for Summary Judgment

Summary judgment is proper only if the record reflects "no genuine issues of material fact" and the movant is entitled to judgment as a matter of law. *Hadfield v. McDonough*, 407 F.3d 11, 15 (1st Cir. 2005) (citing Fed. R. Civ. P. 56(c)). Where the Parties have filed cross motions for summary judgment, the Court evaluates each motion independently and determines "whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assurance Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (quoting *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)). Courts should grant summary judgment "if . . . there can be but one reasonable conclusion" come trial; but if "reasonable minds could differ," the Court should not enter judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986).

### A. The Parties' Arguments

Actian moves for summary judgment, asserting VDS infringed its copyrights and breached the EULA by exceeding its scope. ECF No. 356 at 9–10. VDS cross-moves for summary judgment, arguing both of Actian's claims fail as a matter of law, the Court should enter declaratory judgment in favor of VDS, and the Court should dismiss Covetrus as a counter-defendant. ECF No. 364 at 7. The Parties' respective arguments both for and in opposition to summary judgment largely overlap.

#### 1. Breach of Contract

Per the EULA's choice of law provision, Texas law governs the breach of contract claims, which requires a showing of: (1) a valid contract; (2) performance by the claimant; (3) breach by the defendant; and (4) resulting damages. *Tiras v. Bailey Props., L.L.C.*, 659 F. App'x 753, 756 (5th Cir. 2016). The Parties do not dispute that the EULA is a valid contract and that Actian fully performed by providing the relevant Software. *See* ECF No. 356 at 7–8; ECF No. 38 at 5. Rather, Actian alleges three primary breaches.

First, Actian alleges VDS violated Section 6 of the EULA, which states, "You may not use, access, or allow access to the Software in any manner to provide service bureau, ASP, time-sharing, or other computer services to third parties without prior approval of Pervasive" by providing computer services to third parties. ECF No. 356 at 12. Actian contends VDS acted as an unauthorized "middleman," using the Software to ingest and migrate date for third-party veterinary offices. *Id.* at 12–13.

Second, Actian asserts VDS over-deployed the Software in violation of Section 1 of the EULA by installing the Software on twenty-one host computers, rather than the three which VDS had licensed. *Id.* at 15; *see* ECF No. 235-1 at § 1.A (Section 1 of the EULA reads, "You may install the Software only in a single location on a hard disk or other storage

10

device. You may install the Software on a network server used only to install or run the Software over an internal network; however, you must acquire and dedicate a license for each individual who will use the Software."). Similarly, Actian claims the 2021 Audit indicated VDS exceeded the number of licensed users by nine users, and VDS installed the Software on twelve AzureVM servers which were outside VDS's internal network. ECF No. 356 at 16. Actian further claims the EULA requires a separate license for installation on each "core"[6] of a Central Processing Unit ("CPU"), rather than a license for each overarching computer system, and that VDS had forty-two unlicensed cores running all or part of the Software. *Id*.

Third, Actian contends damages should reflect the cost of the commercial licenses VDS allegedly should have purchased, rather than the non-commercial licenses they did purchase. *Id*. at 17–19.

Turning to the alleged breach itself, VDS contends it did not breach Section 6 of the EULA—which prohibits use by third parties—because VDS personnel alone controlled the Software and customers never accessed it. ECF No. 372 at 24. VDS contends any contrary interpretation is "unreasonable and inequitable." *Id*.

With respect to Section 1 of the EULA, which concerns installation on different computer systems, VDS notes Actian inconsistently claims VDS purchased only one license, despite the 2017 Audit showing it owned three licenses. *Id*. at 26. VDS further

---

[6] Generally, a "core" is an individual processing unit within a larger Central Processing Unit ("CPU"). Modern computers are composed of multiple cores, usually eight or twelve. Version 9 of the EULA, which governs here, makes no reference to cores, but does state, "On multiple-CPU machines, the deployment or runtime Software may not be used concurrently on more CPUs than the number of CPUs specified on the media package or sales invoice. In the event you use any number of physical CPUs, the authorized number of CPUs under this Agreement will be determined based on the number of logical or virtual CPUs." ECF No. 235-1 at § 1.B. Newer versions of the EULA, which do not apply here, make reference to both CPUs and cores. ECF No. 358 at ¶ 34.

11

argues the EULA allows for installation on secondary computers, backup systems, and for programmatic invocation across the organization. *Id*. at 26–27; *see* ECF No. 235-1 at § 2 ("You may make a reasonable number of copies of the Software only for archival backup and security reasons . . . ."); *id*. at § 1.B ("[Y]ou may programmatically invoke the deployment or runtime Software from one or more other machines within your organization."). VDS disputes Actian's interpretation of the EULA as requiring licenses per core rather than per CPU. ECF No. 372 at 27. Finally, VDS argues Actian has failed to establish recoverable contract damages. *See id*. at 27–29.

VDS also argues any breach of contract claim occurred at the time of breach, rather than at the time of discovery. *Id*. at 14. VDS further admits it installed the Software on multiple machines from the outset—as early as 2006, when it first licensed Version 8, or 2011, when it licensed Version 9. *Id*. According to VDS, if its customary use of the Version 9 Software converting third-party data to customers constituted a breach of Section 6, that first breach first occurred in 2006 or 2011. *Id*. at 15. VDS argues, therefore, if a breach occurred, the EULA terminated upon that initial breach (either in 2006 or 2011). *Id*. at 13. VDS contends if the EULA terminated, there was "no valid, active contract . . . , [and] Actian is not entitled to additional contract damages, but must instead rely on copyright damages and remedies." *Id*.

VDS further asserts Actian is estopped from asserting its breach of contract claim due to acquiescence, course of dealing, and waiver. *Id*. at 16. VDS points to trainings Pervasive (now Actian) provided to VDS employees in 2006 and support services provided in 2009, which allegedly acknowledged VDS's third-party data conversions. *Id*. at 17–18. VDS notes the 2017 Audit revealed installation on five production engines—more than the three licenses purchased—yet Actian took no action at the time. *Id*. at 18.

### 2. *Copyright Infringement*

VDS argues copyright law preempts Actian's breach of contract claim. ECF No. 372 at 20. According to VDS, the over-deployment allegations fall within the subject matter of copyright and lack an "extra element" distinguishing them from copyright infringement. *See ML Genius Holdings LLC v. Google LLC*, No. 20-3113, 2022 WL 710744, at *3 (2d Cir. Mar. 10, 2022) (summary order). VDS also reiterates its argument that Actian copyright registrations are invalid because Version 9 does not contain sufficient original, protectable material as compared to earlier versions. ECF No. 364 at 31–32. In response, Actian reasserts the validity of its copyright registrations, citing the Court's prior rulings on the presumption of validity. ECF No. 375 at 32–38.

For the same reasons it advances regarding the breach of contract claim, VDS also argues the copyright claim falls outside of the Copyright Act's three-year statute of limitations. ECF No. 364 at 15 (citing 17 U.S.C. § 507(b)). Actian disputes VDS's statute of limitations arguments and advances multiple tolling and accrual theories. ECF No. 375 at 7–8. First, Actian asserts that each impermissible data conversion constituted a discrete breach that reset the limitations clock. *Id*. at 8. Second, Actian argues that the cause of action accrues only once a breach is complete, not when it first occurs. *Id*. Finally, Actian invokes the doctrines of equitable tolling and estoppel, arguing Plaintiffs cannot benefit from a limitations defense after affirmatively hiding their misconduct. *Id*.

### 3. *Covetrus's Liability*

Covetrus seeks dismissal as a counter-defendant on the ground that it is not a corporate alter ego of VDS nor was it a party or signatory to the original EULA and sales agreement. ECF No. 364 at 21–25. It also seeks summary judgment on claims of secondary or indirect copyright infringement, arguing there is no evidence it induced,

encouraged, or approved any infringement by VDS. ECF No. 372 at 34–36. Actian argues Covetrus is directly liable due to its control over the Software, its deployment of the Software on Covetrus.net servers, and its control over VDS's company operations. ECF No. 375 at 20–25.

### 4. Outstanding Issues

Separately, VDS requests ruling on two outstanding contract interpretation issues: (1) Maintenance Obligations—whether the Version 9 EULA permits the use of the Software without mandatory purchase of ongoing support services, ECF No. 375 at 55; and (2) Damages Metrics—whether any damages available beyond Section 14 must be calculated based on "CPUs" rather than "cores," *id*. at 19–20. In its opposition, Actian provides the following rejoinders as to: (1) Maintenance Obligations—the Support Policy requires purchase of ongoing maintenance services, ECF No. 375 at 26, 29; and (2) Damages Metrics—the damages should be calculated on the basis of "cores," rather than "CPUs," *id*. at 31–32.

## B. Genuine Issues of Material Fact Preclude Summary Judgment

The Court finds numerous disputes of material fact, coupled with the inherently ambiguous nature of the governing contract, preclude summary judgment on the contested claims and counterclaims.

### 1. Breach of Contract: Ambiguity in the EULA

Before the Court can determine whether a breach occurred, it must first define the obligations set forth in the contract. The Court concludes that Section 6 of the EULA is ambiguous as a matter of law, necessitating a factual inquiry by a jury to determine the Parties' intent. Section 6, entitled "Leasing/Rental Prohibited," states: "You may not directly or indirectly sublicense, lease or rent the Software for third party use without

14

prior written approval of [Actian].[7] You may not use, access, or allow access to the Software in any manner to provide service bureau, ASP, time-sharing, or other computer services to third parties without prior written approval of [Actian]." ECF No. 91-1 at § 6. The Parties fundamentally dispute whether Section 6 prohibits VDS from providing data integration services to third parties. VDS argues "use" requires direct access by a third party. Actian argues "use" includes providing services via the software even without third-party access. If the Court were to interpret "use" to mean only "allowed direct access," as VDS contends, it would render the subsequent words "access" and "allow access" redundant. The Court is not inclined to render contract provisions meaningless. *See Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998) ("We must also attempt to give effect to all contract provisions so that none will be rendered meaningless."). The Court thus rejects VDS's argument that "use" in this context means "allowing access" to a third party.

Additional ambiguities remain regarding other terms. The EULA fails to define the term "other computer services." VDS argues that because the other listed services involve direct access, "other computer services" must also include direct access to the user interface. ECF No. 397 at 18–19. Actian maintains that the data integration services VDS provided is a form of "computer service[]."[8] ECF No. 400 at 8.

Because both interpretations of Section 6 are reasonable, the contract is ambiguous as a matter of law. As such, the intent of the Parties must be submitted to a

---

[7] Pervasive, which is named in the EULA, was the predecessor-in-interest to Actian. ECF No. 235 at 7. Actian merged with Pervasive in 2013, after VDS purchased the Software. *Id.*

[8] The Parties do not present an argument to this effect, but the phrase "in any manner" suggests a potentially broad application of Section 6, which would weigh in favor of Actian's argument that "computer services" includes indirect data migration.

factfinder to determine the scope of Section 6. *See IMS Health, Inc. v. Vality Tech., Inc.*, No. 99-1500, 2000 WL 804436, at *5 (E.D. Pa. June 22, 2000).

### 2. *Factual Disputes Regarding Performance and Technical Standards*

Even if the EULA's terms were clear, the record reflects competing evidentiary accounts regarding VDS's actual conduct that cannot be resolved at this stage. First, the Parties present a material dispute regarding the technical industry standards in 2008, the year in which VDS first entered into a contract with Actian. If "CPUs" and "cores" were treated as synonymous at the time, VDS's installation on 112 cores would constitute a breach of its three-CPU license. But, if the terms are distinct, VDS may have been in compliance. The Parties further dispute the nature and frequency of the alleged breaches in the years preceding this lawsuit, including whether VDS engaged in over-deployment, allowed third parties access in violation of the commercial use provision, or failed to purchase required support services. This includes a fundamental disagreement as to whether third-party veterinary offices ever "access[ed]" or "use[d]" the Software within the meaning of the EULA, or whether those offices were merely provided with the Software's output. Furthermore, because the EULA allows installation on an "internal network" only, a factfinder must determine whether AzureVM and Covetrus.net servers are "internal" network extensions or prohibited "external" third-party hosts. Relatedly, it is necessary for a trier of fact to evaluate the EULA's terms to determine whether they required the purchase of ongoing support services, another point of contention regarding VDS's compliance.

### 3. *Statute of Limitations and Equitable Defenses*

Outstanding factual issues similarly preclude summary judgment on the statute of limitations challenges. Under Maine law, which applies through the traditional approach

of the Restatement (Second) of Conflict of Laws, "the statute of limitations of the forum controls, even if the substantive law of another state applies." *Henderson v. Laser Spine Inst.*, 815 F. Supp. 2d 353, 380 (D. Me. 2011) (quotation modified). However, the application of the "discovery rule" and related equitable defenses—such as estoppel, waiver, and fraudulent concealment—turns on "archetypal factual issues fit for jury resolution." *Melendez-Arroyo v. Cutler-Hammer de P.R. Co.*, 273 F.3d 30, 38 (1st Cir. 2001). Specifically, the Parties disagree on when Actian had sufficient information to warrant an investigation of alleged over-deployment. VDS points to 2006 training sessions and 2009 support logs as evidence of notice, while Actian alleges it only discovered the "true infringement" in 2021 and argues VDS affirmatively concealed its deployment scope during the 2017 Audit. A factfinder must decide if and when Actian had enough information to warrant an investigation into VDS's use of the Software, and if VDS affirmatively concealed any deployment to determine whether estoppel applies.

### 4. Derivative Claims; Copyright Infringement and Alter Ego

The Court further finds that the copyright and alter ego claims are unfit for summary adjudication. Regarding copyright infringement, the Parties dispute whether the source code of Version 9 contains original, protectable authorship under 17 U.S.C. § 103, or consists merely of trivial "bug fixes." If the changes are found to be trivial, the copyright registration could be invalid, barring an infringement claim for that specific version. Additionally, the liability of Covetrus depends on whether it is the "alter ego" of VDS. Because veil-piercing is a fact-intensive inquiry involving corporate formalities, capitalization, and the potential siphoning of revenue, it is a determination typically reserved for a jury. *See Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 22 (1st Cir.

1998) ("[Corporate] veil-piercing is the sort of determination usually made by a jury because it is so fact specific." (quotation modified)).

Because these genuine issues of material fact remain, the Parties' motions for summary judgment are both **DENIED**.

### IV. Conclusion

For the reasons stated herein, the Parties' motions for summary judgment are **DENIED**.[9] ECF Nos. 364, 356.

The Court also **DENIES** the Parties' motions to exclude expert testimony. ECF Nos. 354, 355, 371. The reports are reliable and useful to the Court's review and will assist the trier of fact. *See* Fed. R. Evid. 702 advisory comm. note—1972 proposed rules ("Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier.").

**SO ORDERED.**

Dated this 6th day of February, 2026.

/s/ Stacey D. Neumann
**UNITED STATES DISTRICT JUDGE**

---

[9] Because the motions for summary judgment are denied, the Parties' motions to strike statements of fact are dismissed as moot. ECF Nos. 386, 396.